THOMAS R. MEAGHER and ELIZABETH MEAGHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meagher v. Commissioner
Docket No. 2738-74.
United States Tax Court
T.C. Memo 1977-270; 1977 Tax Ct. Memo LEXIS 173; 36 T.C.M. (CCH) 1091; T.C.M. (RIA) 770270; August 15, 1977, Filed John Gigounas and Joseph S. Radovsky, for the petitioners. John T. Lyons, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1971 in the amount of $1,704. Concessions having been made, the only issue remaining for our decision is whether an agreement, which petitioners entered into with respect to their *174 railroad tank car, is a lease, in which case they are not entitled to an investment credit with respect to such tank car because they have not satisfied the requirements of section 46(d)(3). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Thomas R. and Elizabeth Meagher, husband and wife, resided in Oakland, California, at the time they filed the petition herein. Petitioners filed a joint Federal income tax return with the Director of Internal Revenue Service, Fresno, California. In 1971 petitioners purchased and paid for a railroad tank car. Petitioners' names were stenciled on such tank car, it was registered in the name of petitioners, and it was ready and available for use in 1971. On November 8, 1971, petitioners entered into an agreement with Relco Tank Lines, Inc. (Relco), with respect to such tank car. The Relco agreement was entitled "Relco Tank Line, Inc. Management Contract" and included the following provisions: 3. Relco agrees: (a) To place reporting marks on the cars and to perform *175 all managerial and administrative functions necessary for the operation of such cars, including (but not limited to) collecting the mileage or per diem earnings, repairing and maintaining the cars and keeping adequate records of their operation: (b) To use its best efforts to arrange for the leasing of such cars to shippers, railroads or others on long or short-term leases, or on such other terms and conditions as may be satisfactory to it. 4. Owner agrees: (a) To pay Relco a quarterly management fee equivalent to thirty-five (35%) per cent of the Gross Operating Profit earned by the cars subject to this agreement. Gross Operating Profit means the mileage, car rental or other income earned during a calendar quarter, from leasing the cars; less costs and expenses incurred during the quarter for the operation, control and protection of the cars, including (but not limited to): repairs, maintenance and cleaning, taxes and registration fees; insurance premiums; refunds due railroads or others for mileage earnings adjustments; and tariff charges made by railroads against the cars. In the case of damage to the cars or other circumstances whereby insurance benefits or railroad indemnity *176 payments are received, these amounts will be included in the Operating Profit hereinabove referred to; (b) To defend, indemnify and hold Relco harmless from and against any and all loss or damage, including any and all risk of loss or damage to the railroad cars subject to this agreement, and to defend, indemnify and hold Relco harmless from and against any and all claims, damages, expenses, or liabilities, incurred by, or asserted against it, as a result of its (or any other party's) operating, possession, control or use of such cars.Relco will obtain insurance coverage naming the owner as co-beneficiary and insuring him against the risks and liabilities referred to herein. (c) That, in the event of a total loss or destruction of any of the cars, Relco has the option of replacing the car with a similar car or of paying the owner for the value of the car out of the proceeds from Railroad and/or Insurance Indemnification. (d) That Relco may paint the cars subject to this agreement in such colors as Relco may desire and that Relco shall have the right to place AAR reporting marks and any other marks or legends it deems appropriate, in conspicuous places on such railroad cars; *177 (e) That Relco may deduct its quarterly management fee to the extent earned hereunder, from the Gross Operating Profit earned by the cars; (f) That Relco may maintain a cash deposit or continuous reserve for expenses in an amount not to exceed two-hundred dollars ($200.00) per car and that such amount may be deducted from the net earnings payable to Owner hereunder. Owner also agrees to reimburse Relco promptly upon demand for the amount of any expenses incurred by Owner's cars in excess of the amount set aside in the reserve therefore. Upon termination of this agreement and after all expenses and adjustments including (but not limited to) estimated adjustments for refunds and mileage equalization payments, chargeable to Owner's cars have been deducted by Relco, any sums remaining in said reserve for expenses shall be paid to Owner, after allowing a normal time for the receipt of expense bills. (g) That Relco may report the cars to state and other taxing authorities on behalf of the Owner, for the purpose of establishing the amount, if any, of ad valorem property taxes to be assessed against the cars. (h) That during the period this agreement is in effect and for six(6) *178 months thereafter, it will not sell or dispose of the cars subject hereto without offering Relco the right to purchase such car or cars for the same consideration (computed in United States' dollars) at which it is being offered to others, less the amount of any broker's fees or sales commissions incurred by Owner, in connection therewith. Relco shall have thirty (30) days after receipt of written notification from Owner of such proposed sale or disposition within which to exercise its right of first refusal. 5. For all purposes of this agreement, it is mutually agreed that, in order to dampen fluctuations between individual car earnings, Relco may pool income and expenses of cars of the same type, size and classification managed by it under this form of contract.Each car in the pool will share pro-rata for the quarter and proportionately for part quarters. The cost, if any, of improvements or modifications to cars required to be made by the Association of American Railroads shall not be pooled but shall be paid for by the owner of the car concerned. * * *
7. This contract may be terminated at any time by either Owner or Relco, subject to the performance in full of all *179 terms and conditions of any (and all) existing leases of the cars described herein, upon giving at least ninety (90) days advance notice in writing of intent to terminate, but only after this contract has been in effect for at least ten (10) years. Written notice of termination shall be deemed duly delivered if placed in a sealed envelope, properly addressed to the party against whom the right of termination is asserted, and thereafter deposited with the United States Post Office and sent by certified mail, return receipt requested, with firstclass postage thereon fully prepaid. Pursuant to the agreement, Relco entered into several lease agreements with Mobil Oil Company (Mobil). All of such leases were for terms of two years or less. Relco obtained a master policy of insurance to cover tank cars and such policy was extended to cover petitioners' tank car. The insurer under the master policy issued a certificate to petitioners naming them as additional named insureds for their tank car. The cost of such insurance premiums was deducted from petitioners' share of gross earnings in quarterly tank car earnings statements which Relco sent to petitioners. In 1971, Relco had an average *180 of 125 tank cars under its control. On their 1971 return, petitioners claimed a useful life of 12 years for their tank car and took an investment credit of $1,505, which respondent has disallowed. OPINION Respondent argues that the Relco agreement is a lease rather than a management contract, so that section 46(d)(3) [2] applies and denies any investment credit to petitioners because they have not satisfied either of that section's alternative requirements. We disagree. *181 The Relco agreement was entitled "Relco Tank Line, Inc. Management Contract" and it is clear that the parties intended to enter into such a contract rather than a lease. However, we must look to the substance of the Relco agreement rather than its form in order to determine its true character. Kingsbury v. Commissioner,65 T.C. 1068 (1976). The existence of control over the venture by the property owner and a risk of loss on the property owner are key factors indicating a management contract. State National Bank of El Paso v. United States,509 F. 2d 832 (5th Cir. 1975); Kingsbury v. Commissioner,supra; University Hill Foundation v. Commissioner,51 T.C. 548 (1969), revd. on another issue 446 F. 2d 701 (9th Cir. 1971).
While petitioners did not directly control the leasing activities of Relco with respect to their railroad car, they exercised a degree of control over the venture at the outset by including certain provisions in the agreement which controlled Relco's participation. Such provisions required Relco to keep adequate records of the tank car's operation, to use its best efforts to *182 arrange for leasing of petitioners' tank car to shippers, railroads, or others, to obtain insurance coverage for the tank car naming petitioners as co-beneficiaries, and to pay the net earnings of the tank car (as defined herein) to petitioners within ninety days after the end of each calendar quarter except that Relco was authorized to maintain $200a reserve for expenses. While the terms and conditions of the leases with third parties were left to Relco's discretion, petitioners nevertheless had sufficient control over the venture to support our conclusion that Relco was acting as petitioners' agent, under a management contract, in leasing the tank car. This view is strongly supported by the fact that risk of loss rested squarely on petitioners' shoulders. Cf. 2 Restatement, Agency 2d, sec. 385, comment (a) (1958). Under the Relco agreement, petitioners agreed to reimburse Relco promptly upon demand for the amount of any expenses incurred by their tank car in excess of the amount of the $200 reserve and to defend, indemnify, and hold Relco harmless from and against all risk of loss or damage to their tank car as well as all claims, damages, *183 expenses, or liabilities, incurred by, or asserted against it, as a result of the operation, possession, control, or use of their tank car. The provision in the agreement allowing Relco to pool the income and expenses of similar tank cars managed by it under similar contracts may have decreased the probability that petitioners would realize a loss, but it did not shift the risk of loss which remained on petitioners. If this contract were held to be a lease it would be a strange one, for the "lessee" would be required to pay"rent" only if its use of the property resulted in net profit. Congress intended, by passage of section 46(d)(3), to deny the investment credit to noncorporate lessors in mere investment or financing situations by limiting its availability to those situations in which the lessor retained the risks and obligations typically associated with the transaction of an active business. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 513; Rev. Rul. 76-266, 1976-29 I.R.B. 7, 8. Under the Relco agreement petitioners assumed the risks of a normal business transaction, not mere passive investment or financing risks. Accordingly, we hold such agreement *184 to be a management contract so that the provisions of section 46(d)(3) are inapplicable. Consequently, petitioners are entitled to the investment credit with respect to their tank car. Because of concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as in effect during 1971.↩
2. (3) Noncorporate lessors.--A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if-- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.↩