**O. Robert FREESEN, et al., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–2992.

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1986.

Decided Aug. 8, 1986.

---

■

Kimball R. Anderson, Winston & Strawn, Chicago, Ill., for petitioners-appellants.

Joan I. Oppenheimer, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

PER CURIAM.

The Internal Revenue Code allows a tax credit for investment in certain depreciable property. See 26 U.S.C. § 38. The Code also allows deductions for depreciation in excess of the "straight line" amount. See 26 U.S.C. § 168. But a lessor that serves merely as a financier or as a putative purchaser of tax advantage may not take an investment tax credit for the leased property, 26 U.S.C. § 46, and must treat as an item of tax preference the excess depreciation on that property, 26 U.S.C. § 57, which increases the alternative minimum tax.

Freesen Equipment Co. (Equipment Co.) purchased some earth-moving equipment that it contributed to a topsoil removal venture in which it was a partner with Freesen, Inc. (Freesen). The Commissioner determined that Equipment Co. was a lessor of the earth-moving equipment and that the lease was a net lease. Consequently, he disallowed the claims of Equipment Co.'s stockholders for investment tax credits and treated the excess of accelerated over straight-line depreciation as an item of tax preference. The Tax Court agreed with the Commissioner. 84 T.C. 920 (1985).

I

Freesen agreed with Peabody Coal Co., in 1978 to remove and replace topsoil at three of Peabody's coal mines. Petitioners, ten of Freesen's stockholders, formed

Equipment Co. as a subchapter S corporation. Freesen and Equipment Co. entered into an agreement (the Agreement) that required each to fulfill some of Freesen's obligations under the Peabody contracts. They characterized their cooperation as a "joint venture"; we shall call it the Venture without deciding whether the characterization, which the Tax Court rejected, 84 T.C. at 939–44, was appropriate.

The Agreement required Equipment Co. to furnish a variety of heavy duty tractors, some trucks, and two motorgraders. Equipment Co. was to service and maintain all the equipment it provided; it was to procure and maintain insurance to cover personal injury, death, and property damage, and to handle claims by third parties against the Venture. Equipment Co. was to purchase and deliver fuel for, provide security and protective services to guard, establish and maintain adequate service-logs on, and remove from the work site, any equipment used, whether or not Equipment Co. furnished the equipment. Freesen was to provide all other services and equipment, including direction of the work described in the Peabody contracts. Freesen was to collect on behalf of the Venture all money due under the Peabody contract. The Agreement provided that Equipment Co. would bill the Venture monthly "for advances on equipment usage and the actual costs for service personnel, insurance, taxes, fuel and lubricants, and parts replaced or repaired on vehicles repaired or replaced under the services and maintenance provisions" of the Agreement.

The parties divided the proceeds according to the Venture's success or failure. The Venture paid third parties first, for fuel, parts, and other goods or services. The Agreement designated all remaining funds as "net profits." [1] It specified that at the end of the year "the parties shall make a general accounting of net profits

and loss after allocation of costs of the joint venture. The first $1,100,000.00 of net profit shall be paid to Equipment Co. The next $2,200,000.00 of net profit shall be paid to [Freesen]. Any net profit over $3,300,000.00 shall be divided equally between the parties.... Losses shall be shared on the same proportional basis as profits are to be distributed."

In 1978 receipts exceeded payments to third parties by $2,398,115. Thus, Equipment Co.'s share was $1,100,000. Freesen's share was $1,298,115. In 1979 Peabody renewed its contracts with Freesen, and Freesen and Equipment Co. extended the Venture to cover the renewed contracts. This time receipts exceeded payments by $5,165,153. Equipment Co. took $2,032,577, Freesen $3,132,576. In 1980 there were again new contracts between Freesen and Peabody (although only two mines were covered). Again Freesen and Equipment Co. extended the Venture, this time modifying the Agreement to change the amounts but not the method of distributing the net proceeds. Equipment Co. took the first $900,000 and began to share equally at $3,100,000. Receipts exceeded payments by $3,569,165. Equipment Co. netted $1,132,717, Freesen $2,436,448.

Appellants, Equipment Co.'s stockholders, claim investment tax credits for the equipment Equipment Co. purchased and seek to deduct accelerated depreciation without treating the deductions as items of tax preference.[2] No one disputes that the equipment is of the type qualified for the tax treatment the appellants claim. But because the Commissioner and the Tax Court characterized Equipment Co.'s contribution to the Venture as a "net lease" of equipment—that is, a lease under which the lessee pays all expenses attributable to the leased property's use—each determined that investment tax credits are unavailable

---

**1.** The Agreement uses "net profits" instead of the more apt "net proceeds." A true determination of profits would account for the cost to the Venture of the capital and labor the venturers supplied. This distinction is unimportant for current purposes, however.

**2.** Although Equipment Co. owned the equipment in question, its stockholders stood to gain from the tax advantages of ownership by virtue of the pass-through provisions for subchapter S corporations. See 26 U.S.C. § 1361 *et seq.*

and that depreciation deductions in excess of straight line are items of tax preference.

## II

The Tax Court held that the arrangement was a "lease" because the Venture was not really a *joint* venture and because Equipment Co. received monthly advances. 84 T.C. at 936–44. We shall not pursue this point, which the parties hotly debate, because we conclude that if this arrangement was a lease, it was not a *net* lease. Whether this was a net lease depends on the attribution of the expenses of the Venture; the attribution in turn depends on the purpose of the "lease" limitation on the tax credit, with which we begin.

The investment tax credit established by 26 U.S.C. § 38 allows the purchaser of certain depreciable business assets to claim a credit against income taxes. A credit reduces the net cost of purchasing an asset. The result is more investment in eligible property, which Congress believed would "increase economic productivity, output, and growth by creating a tax incentive for the purchase of machinery, equipment, and other property used to produce goods or [to] run a business." *Illinois Cereal Mills, Inc. v. CIR*, 789 F.2d 1234, 1236 (7th Cir. 1986). See also *Illinois Power Co. v. CIR*, 792 F.2d 683, 685–87 (7th Cir.1986); *Comdisco, Inc. v. United States*, 756 F.2d 569, 572 (7th Cir.1985); see H.R.Rep.No. 1447, 87th Cong., 2d Sess. 11 (1962); S.Rep. No. 1881, 87th Cong., 2d Sess. 10 (1962), U.S. Code Cong. & Admin.News 1962, p. 3304. But much equipment will be bought with or without a credit, and for this equipment the credit reduces the return to the Treasury without adding to productivity. The credit, like other subsidies, may even have deleterious effects. A business compares the cost of an asset against the value of the income the asset will produce. When the asset is worth even a little more than the cost, it is beneficial to the business and the economy alike. But what if the value is a little less than the cost and there is an investment tax credit? If a business uninfluenced by the combination of taxes and tax subsidies would not make a purchase, it should not be made. Yet this business might buy the asset if the credit were large enough and the business either had tax liability that the credit could offset or could sell the credit to a firm that did.

Congress sought to deal with the potential problems caused by unnecessary credits by restricting the categories of eligible equipment (see *Illinois Power Co.*). It addressed potentially wasteful investment by limiting the credit to the taxes payable by the investor. If Firm A has $100,000 worth of tax credits and owes only $50,000 in tax, the remaining $50,000 is lost (unless it may be carried back or forward). Firm A may not sell the credit to another firm that has surplus, unsheltered taxable income. The firms most likely to sell a credit are either new firms without profits or firms that have consistently lost money and so owe no taxes against which to use tax credits. The lack of profits suggests that firms are not making good use of their current assets and should shrink. If money-losing firms could sell their tax credits, however, they might go on investing in new equipment; the tax credit would become a form of subsidy for unsuccessful firms and would distort economic incentives. A rule against the sale of tax credits confines the benefits to successful firms, diminishing the risk that the credit will induce wasteful investments.

Although credits may not be sold, they may be transferred by leasing. Suppose Firm B is losing money and has no use for tax credits but wants to buy new equipment, and Firm C is profitable and wants to reduce its taxes but does not need new equipment (or owes taxes even after using all of the credits for the equipment it needs in its own business). These firms can strike a deal. Firm C could buy the equipment Firm B needs, take the tax credit, and lease the equipment to Firm B. They could share the tax benefits through a reduction in the payments under the lease. This arrangement would be the functional equivalent of allowing Firm B to purchase the equipment and sell the tax credits to

Firm C—in either case, Firm B would get the equipment for a net outlay less than its market price and Firm C would reduce its taxes even though it had not purchased equipment for its own use. The use of tax credits to shelter unrelated income would be even clearer if Firm C had no business of its own but was formed simply to buy and lease assets, and spin tax credits out to its investors, who may seek to shelter their personal income from taxes.

The tax code could avoid the problem by prohibiting tax credits on account of leased equipment, but this would create a new distortion. Some firms in the business of leasing (auto rental businesses are one example, computer manufacturers that lease their products as an alternative to outright sale another) do not pose any risk of using tax credits to shelter unrelated income; these lessors use the leased property as part of their own productive activity and are not conduits for tax benefits. A denial of tax credits would induce these firms to sell rather than lease, or would disfavor leasing, even though leasing may be the most efficient way to vend the assets.

So the practical problem facing the drafters of the tax code in 1971 when they added the provision that is now § 46(e)(3) was how to allow companies that produce valuable goods and services by leasing to claim the credits, while denying the benefit to firms that have used the lease form only to evade the rule against the sale of tax credits. Any solution will have rough edges. During the last few years Congress has changed the rules several times, adding "safe harbor leasing" in 1981, to make the transfer of credits via leases easier, but repealing these rules while establishing a category of "financing leases", which restricted the transfer of benefits, about 18 months later. The provisions we discuss here have been in force continually since 1971. The rule governing these transactions is 26 U.S.C. § 46(e)(3), which restricts use of the credit by a lessor to cases in which:

(A) the property interest subject to the lease has been manufactured or produc-

ed by the lessor, or (B) the term of the lease ... is less than 50 percent of the useful life of the property, and ... the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 [ordinary and necessary business expenses,] (other than reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

The manufacturer-lessor obviously is not a conduit for a credit. The pure lessor covered by § 46(e)(3)(B) is a harder case. The 50% test ensures that the lessor bears much of the economic risk of the property. In our example, Firm C may not lease the property to Firm B for its useful life but must assume the risk that the property will depreciate faster than expected (and the concomitant risk in leasing it again—or finding itself unable to lease the item again). The 15% test ensures that the lessor pays for or furnishes services as well as the property. It may not be a passive conduit but must service what it leases. The Committee on Ways and Means stated that it wanted to withhold the credit from lessors whose leases "represent [not] a normal business transaction of the lessor [,but] rather [ ] a passive investment entered into for the purpose of sheltering other income." H.Rep. No. 92–533, 92d Cong., 1st Sess. 29, 1971 U.S.Code Cong. & Admin.News 1825, 1844; see also S.Rep. No. 92–437, 92d Cong., 1st Sess. 43–44, 1971 U.S.Code Cong. & Admin.News 1950–51. A lessor that pays a substantial portion of the asset's maintenance expenses during the lease not only is active (not a "mere" funnel for tax benefits) but also is more likely to bear some entrepreneurial risk. That risk, in turn, will give the lessor the incentive efficiently to maintain the asset. "In these situations, the lease arrangement is an integral part of the taxpayer's business and is not likely to have been entered into for the purposes of reducing tax liabilities." H.R.Rep. No. 92–533, 92d Cong., 1st Sess. 29, 1971 U.S.Code Cong. & Admin.News 1844; see also S.Rep. No. 92–437, 92d Cong., 1st Sess. 43–44,

1971 U.S.Code Cong. & Admin.News 1950–51.

The Commissioner concedes that the Agreement satisfies the requirement that "the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property." The Commissioner also admits that in each year expenses attributable to the leased property exceeded 15% of the amount Equipment Co. received plus the expenses. But whose expenses?

In the Commissioner's view, because the agreements in question required Freesen, Inc. to advance Equipment Co. the costs incurred for service personnel, insurance, taxes, fuel, and parts, admittedly § 162 deductions allowable to someone, Equipment Co. had no § 162 deductions other than reimbursed amounts. The Tax Court accepted this position, 84 T.C. at 945–47. But the advances were just that: advances in anticipation of the annual reconciliation. Only the position of the Venture at year's end determined who got how much of the receipts from Peabody. We must decide who really incurred the § 162 expenses, Freesen or Equipment Co., and the intermediate checkwriting does not answer this question.

■ We take it that the name on the accounting ledger (equipment maintenance) does not control. The Commissioner would not allow a designation as "additional rental payment" to control if the checks really discharged an obligation to reimburse for expenses. See 26 C.F.R. § 1.46–4(d)(3)(ii). Purely formal appellations do not matter, whether they cut for or against the Commissioner. See *Burr Oaks Corp. v. CIR*, 365 F.2d 24, 27 (7th Cir.1966), *cert. denied*, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967). Cf. *Nelson v. CIR*, 793 F.2d 179 (8th Cir.1986). Both sides invoke the rule that form should be respected in tax law—appellants want the form of the joint venture respected, and the Commissioner wants the form of Freesen writing out checks to pay the § 162 expenses respected. Certainly this court respects the forms of business arrangements. In tax the form

often *is* the substance, because the tax depends on the form of the arrangement. *Howell v. United States*, 775 F.2d 887, 890 (7th Cir.1985). But "form" must be distinguished from nomenclature. Tax liability does not depend on a taxpayer's creative writing skills. "Form" means structure of the underlying economic transaction. *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303–04, 55 L.Ed.2d 550 (1978). A transaction with some meaning (independent of tax) must be respected for tax purposes even if an economically identical transaction in a different form would have had different tax consequences. So we respect the form of the dealings between Equipment Co. and Freesen, but we do not think that what they called their method of paying maintenance expenses is important. The parties supply the forms and tax law supplies the labels for and consequences of those forms.

Even if we treat the contribution of equipment to the Venture as a lease, Freesen and Equipment Co. were partners in the Venture. Who bears the incidence of § 162 expenses in a partnership? When partners contribute assets and labor to a partnership and the partnership is profitable, it is difficult to say who pays the partnership's expenses. In one sense the partnership pays them. In another the partners do, in proportion to their marginal or average shares in the returns. Each partner receives money from the partnership. He does not trifle to determine whether "he" paid the expenses or the "partnership" did. The distinction between these two views is neither formal nor substantive; it is no distinction at all. Yet we must draw such a non-distinction here. Equipment Co. contributed its equipment and received money in return. The Venture maintained the equipment through Equipment Co.'s supervisors plus third parties who were compensated for their work. These maintenance expenses are allowable § 162 deductions. But whose? The Venture's? Equipment Co.'s? Freesen's?

One possible inquiry is who bore the costs on the margin. We could look at

what the Venture took in, calculate the payout each party would have received had there been no § 162 expenses, and see whether Equipment Co.'s share changes by more than 15% once the expenses are recognized. But this process, because it looks at marginal returns, is very sensitive to how the Venture did each year. In 1978 the Venture had gross proceeds of a trifle more than $3.3 million dollars. Had there been no § 162 expenses, Equipment Co. would have taken $1,100,300.50 and Freesen $2,200,300.50. After expenses of $902,486 the totals become $1,100,000 for Equipment Co. and $1,298,115 for Freesen, all because of the payout formula: § 162 expenses first, the next $1.1 million to Equipment Co., the next $2.2 million to Freesen, share alike after that. So in 1978, as things turned out, Freesen bore all but $300.50 of expenses using this approach. But in 1979 and 1980 things were dramatically different. Net proceeds exceeded the amounts at which Equipment Co. began to take half, so in those years Equipment Co. would have had substantial § 162 deductions. In 1979, for example, the Venture took in $6,429,101. But for the expenses, Equipment Co. would have had $2,664,550.50; after expenses it actually received $2,032,577. The difference is more than enough to satisfy the 15% test, as it was in 1980.

The instability of this method is dispositive against it. Nothing in the purpose of the statute or its legislative history provides a reason why a lessor should be disqualified from receiving a tax credit because the lessee's gross receipts change. If Congress had required us to use this ex post, marginal analysis we would not be free to disregard it even if we thought the method erratic. We must look for "what Congress meant *by what it said,* rather than for what it meant *simpliciter.*" Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes,* in *Benchmarks* 218–19 (1967) (emphasis added); *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310 (7th Cir.1986). But Congress did not require an ex post marginal incidence test. To be sure, whether a lessor had allowable deductions of 15% or more as compared to some other percentage is an ex post test. But nothing in § 46(e)(3) requires an ex post decision about *who* bears the incidence of these deductions.

Who bears the deductions should be assessed at the outset, according to reasonable expectations. A party that plays an active role (i.e., is not a passive conduit for tax benefits) should receive the credits if the expenses it anticipates it will bear turn out to be 15% or more. And the appropriate anticipation is that each partner in a venture bears either expenses allocable to its share of the income or an apportionment of expenses according to the ratio of its net proceeds to the venture's total. So in 1978, when the Venture had $902,486 of § 162 expenses, Equipment Co. received $1,100,000, or 45.8% of the $2,398,115 net proceeds of the Venture. The same percentage of the § 162 expenses is $413,964.46. This makes the receipts attributable to Equipment Co. $1,513,964.46 ($1,100,000 + $413,964.46), of which 27.3% represents § 162 expenses. Equipment Co. meets the 15% test. The other years also qualify under this approach. Congress's desire to stimulate the economy but to deny credits to mere financiers supports this view. Equipment Co. supplied the maintenance and took a risk that § 162 expenses would deprive it of the net return for which it bargained—whether because they would hold it below $1.1 million or eat into the 50% kicker over $3.3 million. The *risk* of an increase in maintenance expense is an important element of entrepreneurial risk and may inspire an owner to perform his own maintenance services, a task foreign to a mere financier. Thus if a lessor's return is subject to change because of unpredictable maintenance expense, the expenses should be counted as borne by the party exposed to the risk. Cf. *Bloomberg v. CIR,* 74 T.C. 1368 (1980) (taking an ex ante approach to calculating the length of a lease for the purpose of § 46(e)(3) ).

This is not to say that *any* risk will do. Suppose Equipment Co. was entitled to the

first \$1.1 million of net receipts and nothing more, and all agreed that the expenses would exceed \$1 million—and the Venture's revenues amount to less than \$2.1 million—only in a blue moon. Then Freesen would bear the full weight of the expenses. We would have a pure net lease. But this is not our case. In two of the three years Equipment Co. shared 50–50 in the Venture's marginal receipts. In each of the three the Venture was exposed to loss because of a risk of cancellation by Peabody or underuse of the equipment, which could have driven Equipment Co.'s return under \$1.1 million, forcing it to bear the whole marginal incidence. The Commissioner does not argue, and the Tax Court did not find, that in any year Freesen bore the exclusive risk of significant expenses. A lessor's exposure to risk of significant expense indicates that the lessor is an entrepreneur rather than a financier or buyer of tax shields. This in turn makes it essential to credit the lessor with a share of the § 162 expenses.

■■■ The only ground on which the Tax Court concluded that Equipment Co. was sheltered from the Venture's risk was the advance monthly payments. We have already explained why advances do not matter; the reconciliation at year's end is what counts. Equipment Co. bore a significant portion of the risk in the Venture, the outcome of which it could influence; its income depended in part on maintenance costs that it had an opportunity and obligation to control. Congress meant lessors with this kind of stake in the success of the enterprise to receive the credit, if the expenses should exceed 15% of its receipts. Apportionment of expenses according to the proceeds each venturer receives is a reasonable way to quantify who bears what § 162 expenses. No regulation establishes any other way to proceed. (We need not decide what kinds of tests the Commissioner might establish within his broad discretion.) The expenses, computed this way, exceed 15%, so Equipment Co.'s lease is not a "net" lease. Therefore the Commissioner loses this appeal.

### III

The remaining question is whether the accelerated depreciation deductions on Equipment Co.'s property are items of tax preference under 26 U.S.C. § 57(a)(3). See also 26 U.S.C. § 55 *et seq.* (minimum tax on tax preferences). The appellants and the Commissioner agree that in this case the rules that govern entitlement to the credit are identical to those that govern whether depreciation deductions are items of tax preference. Legislative history supports a view that credits and accelerated depreciation are "coupled." S.Rep. No. 1881, 87th Cong., 2d Sess. 1, 1962 U.S.Code Cong. & Admin.News 3304.

The Commissioner does not, however, concede that our determination on the credit controls. He notes that "in the stipulation of facts, [appellants] conceded that if the court decided that the equipment was subject to a lease[,] for purposes of Section 57(a)(3), then the Commissioner correctly determined that the accelerated depreciation deductions constitute items of tax preference." The Commissioner would have us hold that the stipulation makes whether there is a "lease," not whether the 15% test was met, dispositive.

The appellants indeed make the concession that the Commissioner attributes to them. The Commissioner, however, misunderstands the concession. He proceeds as if § 57(a)(3) describes a "lease" and then describes a "net lease" as a subset of leases. If this were true then the appellants' concession regarding "a lease, for the purposes of § 57(a)(3)," would be a concession that forbade appellants' reliance on their ability to avoid the "net lease" provision. But this hypothetical § 57(a)(3) is not the actual one. Section 57(a)(3) provides, in part, that items of tax preference are "[w]ith respect to each item [of depreciable property] which is subject to a lease, the amount by which ... the deduction allowable ... for depreciation ... exceeds ... the deduction which would have been allowable ... under the straight-line method...." And the Commissioner's own regulations provide that "[s]ection 57(a)(3) ap-

plies *only if* the [depreciable] property is the subject of a net lease...." 26 C.F.R. § 1.57–1(c)(6) (emphasis added). Section 57(c) separately defines net leases.

■ For the purposes of § 57(a)(3), then, a "lease" *is* a "net lease" and not anything else. As a result, our conclusion that Equipment Co.'s arrangement is not a "net lease" also shows that it is not a "lease, for the purposes of § 57(a)(3)". The accelerated depreciation did not give rise to items of tax preference.

We are conscious that Equipment Co. looks like a shell designed to funnel tax benefits to its investors, who are among the investors in Freesen. But the Commissioner has treated the two firms as if they dealt at arms' length; we must do likewise. The Commissioner also allowed Equipment Co. to pass tax benefits through as a subchapter S firm, even though under both statute (26 U.S.C. § 1372(e)(5)) and regulation (26 C.F.R. § 1.1372–4(b)(5)) a firm receiving more than 20% of its income from rents may not elect to be treated under subchapter S. We need not say whether Equipment Co. could have passed tax benefits to its investors had the Commissioner pursued one of these alternative lines.

REVERSED