John H. **NEWMAN** and Claudia C. **Newman, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.***

**No. 551, Docket 89–4051.**

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1989.

Decided Jan. 23, 1990.

---

* Editors Note: This opinion was originally published at 894 F.2d 560. It is published here as corrected.

R. Donald Turlington, New York City (Steven W. Laird, Stuart B. Katz, and Brown & Wood, New York City, on the brief) for appellants John H. Newman and Claudia C. Newman.

Pamela C. Berry, Atty., Dept. of Justice, Tax Div., Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Ann B. Durney, Attorneys, on the brief) for appellee C.I.R.

Before TIMBERS, PIERCE and MINER, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants John H. Newman and Claudia C. Newman (collectively "Newman") appeal from a decision filed November 30, 1988, and entered January 17, 1989, in the United States Tax Court, Mary Ann Cohen, *Judge,* which determined a deficiency totaling $5,556 for the tax year 1982 in Newman's federal income taxes. 56 T.C.M. (CCH) 748 (1988).

The appeal arises from an investment tax credit ("ITC") that Newman claimed for his purchase of a tractor-trailer truck in 1982. The Commissioner of Internal Revenue ("Commissioner") disallowed the credit. The Tax Court upheld the Commissioner's determination, ruling that Newman leased the truck to a third party, Schultz Transit, Inc. ("Schultz Transit"), after he purchased it, and therefore was not entitled to claim the ITC. On appeal, Newman claims that the agreement in question was not a lease but an employment agreement between Newman as employer and Schultz Transit as independent contractor. The parties agree that the determination of tax liability turns on that question.

For the reasons which follow, we vacate the decision of the Tax Court and remand the case with instructions to enter a decision for appellants.

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

Schultz Transit is a corporation engaged in the trucking business. Prior to 1980, its

business was limited to operating trucks it owned or leased. That year, it developed a plan that would allow it to expand operations without incurring the risks associated with ownership or leasing. The plan contemplated inviting investors to purchase trucks specified by Schultz Transit (Peterbilt Model 362 cabover tractors and dual-axle Pine trailers). The investors would then agree to have Schultz Transit operate the trucks.

The plan called for Schultz Transit to collect the gross revenues for the trucks' operation and subtract 21% of those revenues as compensation. That amount was to be subtracted whether or not the trucks turned a profit. In return, Schultz Transit was to operate the trucks to maximize profits in good faith, subject to its discretion to use them in a commercially reasonable manner. The investor-owners were to pay all operating expenses (fuel, maintenance and the like). Schultz Transit was to advance those costs and collect reimbursement from the gross revenues. If the revenues did not cover Schultz Transit's compensation and the operating costs it laid out, the owners were to be personally liable for the deficit. The owners bore the risk of injury to third parties and their property. Schultz Transit bore the risk of injury to cargo carried on the trucks. The plan called for the owners to receive a monthly accounting of revenues and expenses.

Schultz Transit asked S–NY Management Corp. to draft the operating agreement and to act as managing agent for the investor-owners. S–NY was controlled by one Tom Beener (an attorney with whom the officers of Schultz Transit were familiar) and others. S–NY drafted the operating agreement and also drafted a management agreement. The parties to the latter were to be S–NY and the investor-owners. In exchange for managing the investments, the agreement called for S–NY to receive a fee. One significant feature of the management agreement was a pooling arrangement (eight investor-owners were necessary to make the plan operative), whereby gross revenues on the one hand and operating expenses on the other would be pooled and divided. Schultz Transit was not a party to that agreement.

Newman, an attorney (Claudia Newman is a party to this appeal only because she was a co-signer of the joint tax return), was attracted by S–NY's private placement memorandum, dated October 14, 1982, which outlined the foregoing facts in greater detail. One of the elements of the agreement that he found attractive was that, according to S–NY, as an owner of a truck he would qualify for an ITC. While the law is clear that a non-corporate *lessor* of a truck would not be entitled to the credit under these circumstances, 26 U.S.C. § 46(e)(3) (1982), S–NY believed that the agreement between Newman and Schultz Transit would be one of owner-independent contractor, and therefore would allow Newman to claim the credit. The Tax Court found, and Newman concedes, that he was a full-time practicing attorney at all times relevant to this appeal, and that Schultz Transit exercised total day-to-day control of the truck throughout the life of the agreement.

Relying on the private placement memorandum, Newman signed the operating agreement with Schultz Transit and the corresponding management agreement with S–NY in December 1982. The term of the agreements was five years. Newman, however, was permitted to cancel them if he did not realize at least $5,037 in net profits in any three consecutive calendar months.

S–NY arranged financing on the truck, which cost about $80,000, through an unrelated party. The financing agreement, contained in a pre-printed form, referred to the parties as "lessor" and "lessee" and to the agreement as a "lease." Schultz Transit was to pay the debt service out of Newman's profits, and receive reimbursement for any shortfall.

The agreement did not result in the hoped-for profits. Newman, however, chose not to terminate the agreement immediately. He allowed a deficit totaling $7,500 to accrue until September 1985. At

that point, he decided to exercise his option to terminate. Newman and Schultz Transit then decided to convert the agreement into a traditional lease. The debt Newman owed Schultz Transit was satisfied out of the lease fees.

Newman claimed an ITC on the truck, pursuant to the operating agreement, of $5,556 on his 1982 tax return. The Commissioner, believing that the credit was not applicable because of the nature of the agreement (i.e., a lease), issued a Notice of Deficiency. The Tax Court found that the Commissioner had correctly characterized the operating agreement as a lease, and confirmed the deficiency. *Newman v. Commissioner*, 56 T.C.M. (CCH) 748 (1988). This appeal followed.

The sole issue on appeal is whether the operating agreement is a lease or a contract between an employer and independent contractor. The parties concede that the issue of tax liability will turn on that determination.

## II.

We turn first to the standard under which we review the decision of the Tax Court.

■ The Supreme Court has stated that "[t]he general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n. 16 (1978). In other words, we review de novo the Tax Court's ultimate determination, as a matter of law, that the agreement was a lease, and we review the factual findings underlying that determination under the "clearly erroneous" standard. *Commissioner v. Duberstein*, 363 U.S. 278, 291 (1960).

Since interpretation of the operating agreement is integral to the ultimate determination of liability, we reject the Commissioner's contention that we may overturn the Tax Court's interpretation only if it is clearly erroneous. We are led to that conclusion by the familiar principle that " 'the construction of written contracts ... is a question of law for the court and not one of fact for the jury.' " *Meyers v. Selznick Co.*, 373 F.2d 218, 223 (2 Cir.1966) (Friendly, J.) (citation omitted); *see also Eddy v. Prudence Bonds Corp.*, 165 F.2d 157, 163 (2 Cir.1947) (L. Hand, J.) ("appellate courts have untrammelled power to interpret written documents"), *cert. denied*, 333 U.S. 845 (1948).

## III.

This brings us to a consideration of the merits.

### (A)

The Tax Court correctly held that the form of the operating agreement was a contract between Newman as owner and Schultz Transit as independent contractor. *Newman, supra*, 56 T.C.M. at 757. The Tax Court went on to hold, however, that the form of the agreement should be disregarded and, further, that the agreement was in substance a lease. The Tax Court relied primarily on its findings that Schultz Transit exercised day-to-day control of the truck and that, while Newman would be responsible for losses, his risk was lessened by the pooling arrangement.

■ Like the Tax Court, we believe that, in reviewing a transaction for tax consequences, the substance of the agreement takes precedence over its form. *Helvering v. Lazarus & Co.*, 308 U.S. 252, 255 (1939); *DeMartino v. Commissioner*, 862 F.2d 400, 406 (2 Cir.1988). That is only the beginning of the analysis. We have held in a tax-related context that "when a taxpayer chooses to conduct his business in a certain form, 'the tax collector may not deprive him of the incidental tax benefits flowing therefrom, unless it first be found to be but a fiction or a sham.' " *W. Braun Co. v. Commissioner*, 396 F.2d 264, 267 (2 Cir.1968) (citation omitted); *see also Rosenfeld v. Commissioner*, 706 F.2d 1277, 1282 (2 Cir.1983); *Helvering v. Gregory*, 69 F.2d

809, 810 (2 Cir.1934) (L. Hand, J.), *aff'd*, 293 U.S. 465 (1935).

While we exalt substance over form, we do not ignore the form. The touchstone in determining whether the form of an agreement should govern is the opinion of the Supreme Court in *Frank Lyon*, which held that agreements which were intended to have economic substance, as opposed to mere tax avoidance, should be given effect for tax purposes. 435 U.S. at 583–84. That opinion set forth several factors which are relevant to the present analysis.

The first factor inquires whether there is a legitimate non-tax business reason for the form; in other words, were the parties motivated at least in part by reasons unrelated to taxes? *Id.; Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9 Cir.1987); *Estate of Baron v. Commissioner*, 798 F.2d 65, 72 (2 Cir.1986); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4 Cir. 1985).

■ Applying *Frank Lyon*, the Tax Court held that, since Newman failed to prove that *he* was motivated by non-tax reasons, it was not bound to follow the form of the operating agreement. 56 T.C.M. at 759. As indicated above, we need not determine whether the Tax Court's finding was clearly erroneous in order to reject its legal conclusion. In *Frank Lyon*, the party equivalent to Schultz Transit was a bank that sought to build an office building. For various reasons unrelated to taxes, the bank chose not to enter into a conventional mortgage. Instead, it entered into a sale leaseback agreement with Frank Lyon Co., with the latter acting as owner/lessor. Lyon clearly was motivated, at least in part, by tax considerations. 435 U.S. at 571–72. In view of these facts, the Court held that, as long as one party is motivated by non-tax considerations, even if it is not the taxpayer, the form of the agreement will satisfy this factor. *Id.* at 576.

There is ample evidence that Schultz Transit's motivation was unrelated to tax purposes. For example, Eugene Schultz, the president of Schultz Transit, testified at trial that

"we decided to—what was the best decision for our company ... if we went to a straight lease, we'd have to put it on our balance sheet, which, in effect, is the same thing as owning it ... [the operating agreement] was the best decision for us to do for financial reasons for our company."

The Tax Court failed to address the other *Frank Lyon* factors. Normally, we would remand the case to the Tax Court so that it could make findings of fact on them, but we need not do so where, as here, "the record permits only one resolution of the factual issue." *Pullman–Standard v. Swint*, 456 U.S. 273, 292 (1982).

The second *Frank Lyon* factor requires that the agreement have non-tax "economic substance". 435 U.S. at 583. We have construed that factor to require a "change in the economic interests of the relevant parties." *Rosenfeld, supra*, 706 F.2d at 1282. For Newman, the primary substance was his liability for operating costs and his burden of the risk of operating losses—features absent in leases. Schultz Transit, in turn, was assured of at least recovering costs as a result of the agreement; the absence of a lease guaranteed that it would not lose money.

The remaining factors were not expressly stated as such in *Frank Lyon*, but were relied upon by the Court in reaching its decision. The Court found it relevant that the parties were independent of each other. 435 U.S. at 580. There is no question that Schultz Transit and Newman dealt at arm's length. We find especially persuasive the fact that the parties could not have colluded for tax purposes. Only one ITC was available for the truck. If the agreement was a lease, the ITC belonged to Schultz Transit; if it was an employment arrangement, the ITC belonged to Newman. In effect, Newman bargained for the right to the ITC by assuming the risk of operating losses.

The final *Frank Lyon* factor requires that the parties not disregard the form of the arrangement. *Id.* at 582–83. The Commissioner placed great emphasis on Eugene Schultz's testimony that he thought of the agreement as a type of lease. That testimony, however, is not dispositive of the issue. Mr. Schultz explained that he regarded the agreement as a lease only because the Interstate Commerce Commission regards *all* operating agreements concerning trucks as leases, 49 C.F.R. § 1057.2(e) (1988), and that he was uncertain of the proper characterization for tax purposes. Mr. Schultz admitted that he carried out his part of the bargain in compliance with the form of the operating agreement.

In view of the foregoing, we conclude that the form of the operating agreement chosen by the parties—a contract between an employer and an independent trucking contractor—is valid for tax purposes.

### (B)

Our reading of § 46(e)(3) of the Internal Revenue Code of 1954 ("IRC 1954") (codified in 26 U.S.C. § 46(e)(3) (1982)), further supports the conclusion stated above. Section 46(e)(3) in relevant part provides that the ITC would be allowed to a non-corporate lessor like Newman only if:

"(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property."

By its terms, this provision applies directly only when the non-corporate party already has been determined to be a lessor. On the instant appeal, the issue is whether Newman is a lessor or an employer. He concedes that, if the operating agreement is a lease, § 46(e)(3) would preclude him from claiming the ITC.

Since the text of § 46(e)(3) offers no direct guidance on the question whether Newman is entitled to the ITC, we turn to the legislative history for an indication of the factors entitling lessors or lessees to the ITC. The factor common to the usual § 46(e)(3) inquiry and to this appeal is risk of loss.

The legislative history is not a model of clarity on the subject. The relevant portion of the Report of the House Ways and Means Committee states that the ITC should be available if it applies to "a normal business transaction of the lessor rather than a passive investment entered into for the purpose of sheltering other income." H.R.Rep. No. 92–533, 92d Cong., 1st Sess. 29 (1971), *reprinted in* 1971 U.S. Code Cong. & Admin.News 1825, 1844. That statement can be read in one of two ways. First, it can apply only to those parties engaged in their normal business. Second, it can apply to parties who shoulder the burden of risk of loss, rather than to those who merely seek to shelter income passively.

We conclude that the better reasoned approach is to focus on the risk of loss, which, in this case, rested with Newman. *McNamara v. Commissioner*, 827 F.2d 168, 170 (7 Cir.1987) (stressing "entrepreneurial risk") (citing *Freesen v. Commissioner*, 798 F.2d 195, 199 (7 Cir.1986) (per curiam)). *But see Owen v. Commissioner*, 881 F.2d 832, 834 (9 Cir.1989) (rejecting *McNamara* analysis), *cert. denied*, —— U.S. ——, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990); *Connor v. Commissioner*, 847 F.2d 985, 987–89 (1 Cir.1988) (same). This, we believe, is the only way, as a practical matter, to allow *non-corporate* (i.e., individual) taxpayers like Newman to take advantage of the ITC provision. Such investors may hardly be asked to change careers merely to claim an ITC. Moreover, we are mindful that Congress created the ITC in

order to "stimulate the economy by encouraging the modernization and expanded use of capital equipment and machinery." *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 794 (8 Cir.1976). Many opportunities for investment might be lost if the Commissioner's inquiry were to turn on whether the claimant is "in the business" rather than on whether the claimant is genuinely risking his capital.

The Tax Court discounted Newman's risk due to the pooling arrangement. True, the pooling arrangement eased Newman's risk somewhat, but it did so only in relation to the other investors. As between Newman and Schultz Transit, Newman continued to bear the full risk of operating losses. *Cf. Meagher v. Commissioner,* 36 T.C.M. (CCH) 1091, 1094 (1977) (pooling arrangement does not shift risk under § 46(e)(3)).

The Tax Court also relied heavily on *Amerco v. Commissioner,* 82 T.C. 654 (1984). In *Amerco,* the taxpayer (the parent company of U–Haul) rented trucks to the public. The trucks were purchased by third parties and leased to the taxpayer, who claimed the ITC on the trucks as a "pass-through" lessee. *Id.* at 679–82. While *Amerco* is superficially similar to the instant case, several key elements are distinguishable. First, the taxpayer in *Amerco,* not the Commissioner, claimed that the agreement was a lease, and the Tax Court explicitly gave "great weight to the intent of the parties." *Id.* at 684. Second, the lessee truck company, not the lessor owners, bore the risk that operating expenses would exceed gross revenues. *Id.* at 680–81.

Finally, we reject the Tax Court's reliance on the ICC's definition of all operating agreements as leases. 49 C.F.R. § 1057.2(e) (1988). There is no indication whatsoever that the ICC considered the tax implications of its choice of label. Its choice therefore is not entitled to deference in this context. We also reject the Tax Court's reliance on the fact that the pre-printed loan forms used the term "lease" rather than "employment agreement". "Purely formal appellations do not matter, whether they cut for or against the Commissioner." *Freesen, supra,* 798 F.2d at 200.

## IV.

To summarize:

We vacate the decision of the Tax Court denying Newman the ITC of $5,556. The Supreme Court's holding in *Frank Lyon* requires us to defer to the decision of the parties to enter into an employer-independent contractor relationship. Moreover, we hold that the congressional intent behind IRC 1954 § 46(e)(3) was to foster the sort of investment activity in which Newman engaged.

Vacated and remanded with instructions to enter a decision for appellants.