Guy B. BAILEY, Jr., Lois M. Bailey, Bernard B. Neuman and Miriam Neuman, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 387, Docket 89–4088.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1990.

Decided Aug. 21, 1990.

Pierce O'Donnell, New York City (Michael Malina, Peter Faber, Richard A. De Sevo, Laurie Abramowitz, Kaye, Scholer, Fierman, Hays & Handler; Richard A. Levine, Carlton M. Smith, Roberts & Holland, New York City, on the brief), for petitioners-appellants.

Nancy G. Morgan, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Gilbert S. Rothenberg, Attorneys, Tax Div., Dept. of Justice, Washington, D.C., on the brief), for respondent-appellee.

Before KEARSE and WINTER, Circuit Judges, and LEVAL, District Judge.*

LEVAL, District Judge:

Taxpayers, Guy Bailey, Lois Bailey, Bernard Neuman and Miriam Neuman, bring this appeal from an adverse judgment entered by the United States Tax Court, Irene Scott J., on April 10, 1989 following a trial before Special Trial Judge John J. Pajak. *Bailey v. Commissioner*, 90 T.C. 558 (1988).

---

* Honorable Pierre N. Leval, Judge of the United States District Court for the Southern District of New York, sitting by designation.

The appeal relates to certain disallowed tax deductions flowing from the taxpayers' shares as limited partners in two investment partnerships, which purchased rights in several motion pictures from Columbia Pictures Corp. The Commissioner disallowed the deductions and determined a deficiency for the tax years 1973–1976. The Tax Court substantially upheld the Commissioner's determination. It found that the partnerships were not entitled to depreciation deductions on the films because they had not actually acquired ownership of the films, but only contract rights to participate in the exploitation proceeds of the films. In addition the Tax Court found that the nonrecourse notes (the "Notes") used as part of the purchase price should be excluded from the taxpayers' depreciable basis and disregarded for tax purposes. The taxpayers challenge these rulings on appeal.

## BACKGROUND

The facts are largely undisputed as a result of a stipulation between the parties. In 1973, two individuals with experience in the film industry, Lester Persky and Richard Bright, formed partnerships for the purpose of investing in feature-length commercial films. The partnerships here at issue are entitled Persky–Bright Associates ("Persky–Bright") and The Vista Company ("Vista") (individually and collectively the "Partnerships").[1]

In 1973, Columbia Pictures, a major film studio, was in dire financial straits and needed to raise cash in order to continue to operate. Columbia began to sell its major assets and concentrate on film distribution, which was the most profitable aspect of its business. Among its assets were films which had been completed, but not yet released and distributed to the public. The business plan of the Partnerships was to buy the unreleased films and to license the distribution back to Columbia.

---

1. Persky and Bright are the general partners of both partnerships. The taxpayers are some of the individuals who are limited partners in the Partnerships.

Persky–Bright invested in one film, entitled "Summer Wishes, Winter Dreams." The stated price was $2 million. Vista invested in four films, "Shampoo," "Breakout," "Funny Lady," and "Bite the Bullet." The stated aggregate price was $29 million.

The transaction for "Summer Wishes, Winter Dreams," which is typical, with relatively minor changes of detail, of the acquisitions at issue, was accomplished by simultaneously executed purchase and distribution agreements on October 15, 1973. The $2 million purchase price represented 133.33% of the estimated (and warranted) cost of producing the film.[2] The purchase would be accomplished by three cash payments extending over a one-year period totalling $150,000, plus a nonrecourse promissory note for $1,850,000, secured by a lien on the film and its proceeds. In addition, the Partnership was to prepay interest in cash in the amount of $225,000 by September 1974. The Note was payable ten years from the date of the agreement and bore interest at the rate of 12% the first year, and 10% for each subsequent year. If the principal and interest were not fully paid upon maturity, Columbia was entitled to foreclose on the film and terminate the Partnership's interest.

In exchange, the Persky–Bright Partnership would receive all "right, title and interest" in the film. It was granted the right to approve the marketing strategy of Columbia in regards to the film, which could not be withheld unreasonably. Persky–Bright was to receive credits on all positive prints of the film and in certain advertising.

The parties contemporaneously executed a distribution agreement giving Columbia the exclusive right to distribute the film for ten years, and an option to extend that term in perpetuity.[3] Columbia was to be paid a distribution fee out of the gross receipts of the film. In addition, Columbia was entitled to deduct all of its expenses

and costs from the gross receipts. The net proceeds over and above Columbia's costs and fees would be divided between Persky–Bright and Columbia, Persky–Bright receiving 25% and the other 75% going to Columbia as payment of the Note. After the Note (plus accrued interest) was fully paid, Persky–Bright would receive 100% of the net proceeds.

Among the four films purchased by the Vista Partnership, there was no cross-collateralization between the various Notes and films, so that the success of a particular film would redound to the Partnership's benefit and would not be diverted to pay the Notes owing on other films.

As of the time of trial in the Tax Court, one of the films, "Shampoo," had long since paid its Note in full so that the Vista Partnership was receiving 100% of its further profits. The other four films had thus far failed to cover their Notes. The taxpayers contend, however, that the deficiencies are attributable to Columbia's failure to account properly for the profits. The Partnerships are engaged in litigation with Columbia over its accounting and claim that the proceeds of the other films, upon a proper accounting, will not only pay the Notes in full but produce substantial profits for the Partnerships.

The Commissioner assessed deficiencies totalling $336,704.02 for the years 1973–1976. Appellants petitioned the Tax Court for relief challenging that determination.

### The Tax Court Opinion

The Tax Court made three rulings in favor of the Commissioner which are challenged on appeal:

First, finding that control of the exploitation of the films remained with Columbia, the trial judge found that the Partnerships had not acquired ownership of the films themselves, but only the right to a stream of payments generated by the exploitation

---

2. The stated purchase prices of the four films acquired by Vista was 125% of warranted cost.

3. Columbia could extend the distribution agreement by paying the greater of $15,000 or the "fair market value" of the distribution rights at the time the distribution rights were extended.

The "fair market value" was to be based on the average price previously paid by Columbia to extend distribution rights over comparable films after an initial ten-year distribution license.

of the films. Accordingly, he ruled that the taxpayers were not entitled to receive depreciation deductions on the films.

On the other hand, the trial judge found that because the interest acquired by the Partnerships in the exploitation proceeds was an asset of limited life, the taxpayers were entitled to take depreciation based on their investment in this asset. In determining the basis of this asset for depreciation purposes, the trial judge found that the purchase money Notes were not bona fide debt and did not represent a depreciable investment in the asset. He ruled that only the cash payments (denominated principal and prepaid interest and amounting to slightly more than 10% of the stated purchase prices) were includable in the Partnerships' basis and eligible for depreciation.

Finally, following the same reasoning, the trial judge concluded that, because the Notes were not bona fide debt, the interest payments made on them were not properly deductible.

On April 10, 1989, the Tax Court adopted the findings of the special trial judge.

By stipulation, the appeal of the decision of the Tax Court was brought in this court. On appeal, the taxpayers contend that: (1) the Tax Court erred in denying the taxpayers depreciation on the films themselves, based on the conclusion that the Partnerships were not the owners of the films for tax purposes, (2) in allowing the taxpayers to depreciate their right to the stream of payments generated by the films, the Tax Court erred in excluding the Notes from the depreciable basis, and (3) the Tax Court erred in denying the taxpayers a deduction for the interest paid on the Notes.

## DISCUSSION

■ We engage in de novo review of the Tax Court's legal conclusions, but examine the underlying factual findings under the "clearly erroneous" standard. *See Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); *Newman v. Commissioner*, 894 F.2d 560, 562 (2d Cir.1990).

1. *Ownership of the Films for Tax Purposes.*

We affirm the Tax Court's ruling that the taxpayers were not entitled to a depreciation deduction because the Partnerships were not the owners of the motion pictures for tax purposes.

■ The determination of ownership of an asset for tax purposes is to be based on an analysis of many different factors indicative of ownership, not always on the bare legal title. In a number of cases involving transfers of assets, courts have disregarded the transfer of formal title where the transferor continues to retain many of the benefits and burdens of ownership. *See, e.g., Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Helvering v. F. & R. Lazarus Co.*, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); *Durkin v. Commissioner*, 872 F.2d 1271 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989); *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981).

■ We find that the Tax Court was justified in the conclusion that, upon a complete analysis of the purchase and distribution agreements, Columbia retained ownership of the films. Notwithstanding Persky's testimony concerning his exercise of influence over the marketing of the films, the Tax Court was justified in finding that Persky's interventions were essentially window dressing—and that in reality it was Columbia that exercised complete dominion over the films. Thus, for example, Columbia had the exclusive right to control distribution (which it could unilaterally extend into perpetuity) and the right to determine the title of the films, the date of the initial release and the advertising. Columbia was given the exclusive worldwide rights to the soundtracks. Columbia also had the right to possess and make copies of the negative, as well as the distribution rights for pay television, cable, video cassettes and commercial television. These findings were sufficient to support the Tax Court's conclusion that Columbia retained such sub-

stantial "rights and liabilities commonly associated with ownership," 90 T.C. at 609, that, for the purpose of allocating depreciation deductions, Columbia remained the owner of the films.

### 2. *Depreciable Basis and Deductibility of Interest.*

The Tax Court properly recognized that although the Partnerships had not acquired the motion pictures, they were nonetheless entitled to a depreciation deduction on the asset they did acquire—the right to a stream of payments generated by the motion pictures. The disputed issue is whether the debt represented by the Notes delivered as part of the purchase price is recognizable, both for inclusion in the depreciable basis of the taxpayers' assets and for the deductibility of the interest payments. We remand for further findings on this question.

The Tax Court attached determinative significance to the fact that the Notes were nonrecourse and payable out of exploitation proceeds. It asserted that "when debt principal is payable solely out of exploitation proceeds, nonrecourse notes are contingent obligations and are not treated as true debt." 90 T.C. at 616. "The nonrecourse nature of the debts and the provisions for retaining it were mere paper transactions lacking economic substance." *Id.* at 617.

Although we agree with the Tax Court that the nonrecourse nature of purchase notes, especially when they are payable out of exploitation proceeds of the purchased asset, is a factor that argues against recognition of debt as genuine, this factor is not necessarily determinative. Other factors, particularly a reasonable relationship between the amount of the debt and the value of the securing asset, and incentives to the debtor to pay the debt out of personal assets, may require a different conclusion notwithstanding that notes are nonrecourse. Before reaching a conclusion as to whether the Notes were entitled to recognition for tax purposes, the Tax Court should have made further findings on these issues.

Thus, in *Estate of Baron v. Commissioner,* 798 F.2d 65, 68 (2d Cir.1986) this court wrote, "It is well settled that nonrecourse debt may constitute a part of a taxpayer's basis in property ... as long as the fair market value of the property securing the debt reasonably approximates the principal amount of the debt." We cautioned that "[e]xclusion from basis of nonrecourse debt absent a specific finding on valuation should be permitted only in 'rare and extraordinary cases,'" such as where the valuation is "not reasonably determinable." *Id.* at 70, *quoting* Rev.Rul. 58–402, 1958–2 C.B. 15, 16. In *Baron* we affirmed the Tax Court's disallowance without a valuation only because we found that "even assuming ... [the] projected 'potential' sales were reached, that number was still less than half the number of sales that was required to enable Baron to pay off the principal alone...." *Id.* at 71.

Other circuits have recognized the necessity of making findings about valuation and about the expectations of the parties before nonrecourse debt is excluded from basis. Thus, in *Durkin v. Commissioner,* 872 F.2d 1271 (7th Cir.1989), the Seventh Circuit asserted that nonrecourse debt may be excluded when "the principal is to be paid solely out of exploitation proceeds, the loan is nonrecourse, shielding the taxpayer from personal liability, *and the purchase price of the asset unreasonably exceeds its fair market value.*" *Id.* at 1276 (emphasis added). The Seventh Circuit emphasized that there is no *per se* rule requiring exclusion of nonrecourse debt, explaining that "nonrecourse debt is commonly used in bona fide commercial transactions with genuine business purposes and does not warrant reflexive exclusion from the basis of the asset purchased but necessitates examination of the expectations of the parties and the structure of the transactions." *Id.* at 1276–77.

The Third, Fourth and Ninth Circuits have found the valuation determination to be the principal question in deciding whether nonrecourse debt should be classified as "genuine debt." *See Pleasant Summit Land Corp. v. Commissioner,* 863 F.2d

263, 276–77 (3d Cir.1988) (remanding for findings on fair market value),[4] *cert. denied,* —— U.S. ——, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989); *Odend'hal v. Commissioner,* 748 F.2d 908, 912 (4th Cir.1984), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); *Estate of Franklin v. Commissioner,* 544 F.2d 1045, 1048–49 (9th Cir.1976).

We conclude that the trial court erred in reaching its determination to disallow without making findings on the value of the stream of payments acquired by taxpayers, so as to be able to assess whether the purchase price of the asset including the debt unreasonably exceeded the asset's fair market value.

The trial court relied heavily on the disallowance of nonrecourse debt in two recent Tax Court cases involving motion picture investment partnerships, *Towlinsky v. Commissioner,* 86 T.C. 1009 (1986) and *Durkin v. Commissioner,* 87 T.C. 1329 (1986), *aff'd,* 872 F.2d 1271 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989). Although there are similarities of structure between the Partnerships and those at issue in *Towlinsky* and *Durkin,* there are more important differences.

As to *Towlinsky,* its similarity to this case is relatively superficial. There, the parties had constructed elaborate artificial arrangements, having no economic significance, designed for the sole purpose of deceiving the tax authorities. An illusory third party of no independent interest was interjected into the transaction in order to give it the appearance of a three party negotiation. 86 T.C. at 1038–40. The Tax Court found that the "seller and buyer ... did not negotiate the purchase price at arms length." *Id.* at 1051. The seller retained all substantial rights to the motion picture in perpetuity. *Id.* As to the nonrecourse notes, they amounted to an elaborate artifice, created for the purpose of deception and having no economic substance whatsoever. The notes were not

payable out of the proceeds of the motion pictures' distribution, but out of an accounting construct that had no bearing on the fortunes of the film, the taxpayer, or any other party to the transaction. "No benefit ... accrued to [the partnership] as a result of the retirement of the note." *Id.* at 1049. The notes were essentially a sham. *Id.* at 1057. Whether they were paid or not paid made no difference to any party.

In these respects, *Towlinsky* differs fundamentally from this case. There is no dispute here that the transaction was entered into in good faith and with a profit motive. The Tax Court expressly so found. 90 T.C. at 615. Persky, on behalf of the Partnerships, bargained at arms length with Columbia and obtained many important and valuable concessions. The adversity of the relationship between the Partnerships and Columbia is further evidenced by substantial litigation between them over Columbia's accounting for the profits. The issue is not whether the transactions were bona fide, but rather whether the aspects of the transaction designated by the parties as *debt* should be treated for tax purposes as debt or as a contract to divide exploitation proceeds. The facts of *Towlinsky* are so fundamentally different from this transaction that the ruling there in favor of the Commissioner is of little precedential value. Furthermore, the Tax Court there recognized that "[a] nonrecourse note may reflect a bona fide liability." *Towlinsky,* 86 T.C. at 1048. It was the bogus nature of that transaction which compelled disallowance.

Nor does *Durkin* provide substantial support for the decision below. In *Durkin,* the Tax Court relied on explicit findings that the debt "clearly exceeded the fair market value of the rights the partnerships received." 87 T.C. at 1380. It had concluded upon a close analysis of the transactions, that the amount of the debt incurred by the partnerships was grossly exaggerated in comparison to the value of the assets

---

**4.** The Third Circuit has gone so far as to hold that where the taxpayer employed nonrecourse debt, the taxpayer may include in his basis that portion of nonrecourse debt which equals the fair market value of the property. *Pleasant Summit,* 863 F.2d at 275–77.

and had no business purpose other than "to gain tax benefits." *Id.* at 1378. Thus, the result in *Durkin* depended on findings that have not been made in this case.

In addition to the reasonableness of the relationship between the amount of the debt and the fair market value of the asset being purchased, courts have also stressed the importance of the presence or absence of incentives to the debtor to pay the debt. *See, e.g., Odend'hal,* 748 F.2d at 912; *Durkin,* 87 T.C. at 1376 ("[w]hen a transaction is structured in such a manner, that payment of the debt is not probable, ... [because the] arrangement ... does not provide an economic incentive for the taxpayer to pay the debt, then such debt is not genuine indebtedness"). An allocation of exploitation proceeds which the parties have designated as debt forming part of the purchase price is less likely to be recognized as genuine debt if the transaction is so structured that there is little or no incentive to the debtor to pay the debt with his own assets in the event of a shortfall.

The Tax Court did not discuss a term of these Notes which was of potential significance in assessing that important issue—the fact that Columbia was entitled to foreclose the interest of the Partnerships if the Notes were not fully paid after ten years. The Purchase Agreements provided that, until the Notes and all accrued interest were paid in full, the purchaser would receive 25% of the exploitation proceeds, with 75% going toward payment of the Notes, but that upon payment of the Notes, the purchaser-debtor was thereafter to receive 100% of the exploitation proceeds. Payment of the Notes was secured by the motion pictures. If any principal or accrued interest remained unpaid upon the maturity of the Note, Columbia was authorized "to repossess the Picture securing the Note and recover legal title thereto and the Purchaser shall have no further interest in the Picture."

Thus failure to pay the Note and accrued interest by its maturity could deprive the purchaser of the opportunity to receive 100% of the exploitation proceeds accruing after the ten year mark. The potential effect of this term on the taxpayer's incentive to pay the debt is obvious. If, approaching the end of the ten year term of the Note, the prospects for a further commercial life of the film had a value that exceeded the unpaid balance of the Note, the debtor-purchaser would have a strong incentive to pay the remainder of the debt out of his own assets so as to protect his right to receive 100% of the future exploitation profits in perpetuity.[5]

On the other hand, if the amount of the Note so far exceeded any foreseeable exploitation proceeds that such a circumstance was only of theoretical and not of practical concern, then a court might find, in spite of the seller's right to foreclose in the event of nonpayment, that there was no substantial incentive for the debtor to pay the Note out of his own resources.

For these reasons, it was critically important for the trial court to value the asset purchased, so as to compare its value at the time of purchase with the debt incurred as part of the purchase price. Without such valuation having been made, we cannot determine whether the debt should be recognized as part of the purchase price, whether depreciation should be allowed thereon, and whether the "interest" claimed by the taxpayer should be allowed as a deduction.

The Commissioner argues that, as in *Estate of Baron, supra,* the Tax Court's disallowance should be affirmed in spite of the failure to find value because it is clear that the debt far exceeds fair market value. Although such a conclusion may ultimately prove correct, we do not find it to be obvious. The taxpayers argue that in many respects these transactions, negotiated when Columbia was in dire financial condition, were unusually favorable to the Partnerships. Among the favorable aspects were the absence of cross-collateralization, an unusually low allowance for Columbia's overhead, an advantageous fee schedule,

---

5. Four of the five Notes expressly referred to the right of the Partnerships to prepay outstanding principal and interest.

the Partnerships' entitlement to receive 25% of profits *prior to* paying the Notes, the opportunity for the Partnerships to earn 100% of the films' profits after paying the notes; the obligation on Columbia to pay fair market value to acquire distribution rights in perpetuity after the ten year initial period; and the Partnerships' perpetual ownership of the copyrights, offering them the opportunity to profit in event of a sale. The taxpayers point particularly to the close relationship between the purchase price and the recently incurred cost of producing the films.

The Tax Court should examine each of these aspects of the transaction, as well as all other pertinent facts, in deciding whether the fair market value bore a reasonable relationship to the debt incurred.

### Conclusion

The judgment of the Tax Court is affirmed insofar as it disallowed depreciation of the films themselves. The portions of the Tax Court's ruling that excluded the Notes from the depreciable basis of the stream of payments acquired by the taxpayers and denied the taxpayers a deduction for interest paid on the Notes are vacated; the case is remanded for further findings.

WINTER, Circuit Judge, dissenting:

I respectfully dissent. In my view, a remand is unnecessary because, on its face, the transaction in question was structured as a loan solely to achieve tax benefits, and the "loan" of $1.85 million was without economic significance. Moreover, even if significance is to be attributed to the "loan," its real value was only a small fraction of that amount.

Simplifying only a little and rounding the numbers, the core of the arrangement concerning the illustrative film is that appellants agree to pay $375,000 in cash over two years for the right to 25 percent of the net profits from the film for ten years. If, within ten years, the film nets $2.5 million (actually slightly less, $1.85 million is 75 percent of $2,466,667), appellants then become entitled to 100 percent of the net profits forever, with Paramount retaining an option to the distribution rights. The transaction thus involves an investment, and risk, of only $375,000. The $1.85 million "loan" is irrelevant to this core aspect of the transaction because all the rights described above are vested whether or not the "loan" is paid. On this point, I take it that my views do not differ significantly from those of my colleagues.

My disagreement concerns the wrinkle to the arrangement that comes into play if the film does not net $2.5 million. In those circumstances, appellants have the right, and perhaps an incentive, at the end of the ten-year period to "pay off" the remaining amount due on the "loan" and thereby to become entitled to 100 percent of the film's net proceeds in the future. My colleagues would remand for factual findings on the value of this right.

I am not persuaded that this is a relevant question. In reality, this provision is simply an option allowing appellants to purchase, at the end of the ten-year period, the right to 100 percent of future net profits, if they have not already acquired that right by virtue of the film having already netted $2.5 million. The exercise price of this option is $1.85 million less 75 percent of the net profits accrued over ten years. The "loan," therefore, is merely a tax-motivated characterization of the method by which the exercise price of the option is to be determined.

Even if asking whether the value of this option approximates the size of the "loan" is the right question, the answer is too obvious to require further proceedings. As a matter of simple math this right cannot possibly be worth more than a small fraction of $1.85 million. If the film is a blockbuster success, appellants obtain the rights to 100 percent of the net profits forever well before the ten-year period expires. If the film is not a success, then the purchase price will be high, the value of the films low, and the option will never be exercised. The rare case in which the option might be exercised is one where the film earns less than, but close to, $2.5 million, and appellants conclude that $1.85 million less 75

percent of accrued net profits is an amount less than the future value of the film.

It is inconceivable that a person would stake $1.85 million for an option that will in reality have value only in extremely narrow circumstances ten years hence. After all, the parties themselves had priced the far more valuable right to 25 percent of the net profits over the first ten years, including the right to 100 percent forever if those profits exceeded $2.5 million, at only $375,-000. The fact to be determined on remand can be framed as the price at which appellants could have sold this option right at the time of the agreement. I submit that this price would be a pittance. Certainly, no one would stake an amount approaching $1.85 million for the right to the remaining net profits of a film that, by definition, had failed to earn $2.5 million during its first ten years of distribution.

In sum, the $1.85 million "loan" is merely one part of a formula that determines the exercise price of an option and is not a debt. I would therefore affirm.