GUY B. BAILEY, JR. AND LOIS M. BAILEY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bailey v. Commissioner
Docket Nos. 10193-78, 4505-82, 3781-85
United States Tax Court
T.C. Memo 1992-72; 1992 Tax Ct. Memo LEXIS 77; 63 T.C.M. (CCH) 2000; T.C.M. (RIA) 92072; February 5, 1992, Filed *77 Decisions will be entered in the amounts previously decided. Peter L. Faber, Richard A. Levine, and Carlton M. Smith, for petitioners. Gerald A. Thorpe, for respondent. SCOTT SCOTT SUPPLEMENTAL MEMORANDUM OPINION SCOTT, Judge: These cases were reassigned to Special Trial Judge John J. Pajak, pursuant to the provisions of section 7443A(b)(4) and Rule 180, 181, and 183. [2] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: The U.S. Court of Appeals for the Second Circuit in a divided opinion vacated the portions of this Court's ruling that excluded the nonrecourse notes "from the depreciable basis of the stream of payments acquired by the taxpayers and denied the taxpayers a deduction *78 for interest paid on" those notes and remanded this case for further findings. Bailey v. Commissioner, 912 F.2d 44, 51 (2d Cir. 1990), affg. in part, vacating in part, and remanding 90 T.C. 558 (1988). Petitioner-husbands in this case were limited partners in Persky-Bright Associates (Persky-Bright) and Vista Co. (Vista) (sometimes referred to as the partnerships). The partnerships purchased rights in five motion pictures from Columbia Pictures (Columbia). We held that the partnerships did not acquire ownership of the motion pictures but only contractual rights to participate in the exploitation proceeds of the films. The Second Circuit affirmed our ruling on this point. The prices paid by the partnerships included substantial nonrecourse notes. We ruled that these notes did not have any reality aside from their anticipated tax consequences which were to increase the depreciable basis of each film and to provide substantial interest deductions. As indicated, the Second Circuit has vacated our ruling and remanded this case for further findings. The basic issue we must decide is whether the nonrecourse notes are genuine debt for purposes of *79 depreciation and interest deductions or are merely contracts to divide exploitation proceeds. At the outset, we note that our disposition of the instant case at this point in time is circumscribed by the Second Circuit opinion remanding the specific issues for further findings and our earlier findings of fact, except for our ultimate determination that the nonrecourse notes were not to be recognized for purposes of depreciation and interest deductions, which the Second Circuit vacated. The Second Circuit held that "The issue is * * * whether the aspects of the transaction designated by the parties [partnerships and Columbia] as debt should be treated for tax purposes as debt or as a contract to divide exploitation proceeds." 912 F.2d at 49. In making that determination, the Second Circuit set forth a number of factors to be considered: Although we agree with the Tax Court that the nonrecourse nature of purchase notes, especially when they are payable out of exploitation proceeds of the purchased asset, is a factor that argues against recognition of debt as genuine, this factor is not necessarily determinative. Other factors, particularly a reasonable relationship *80 between the amount of the debt and the value of the securing asset, and incentives to the debtor to pay the debt out of personal assets, may require a different conclusion notwithstanding that notes are nonrecourse. 912 F.2d at 48.
Because the Second Circuit agreed with this Court about the first factor, we shall make further findings only on the other two factors. There is a question as to whether the fair market value of the respective rights purchased by the partnerships should be compared to the purchase price of the asset or to the amount of the debt. Cf. Bailey v. Commissioner, 912 F.2d at 48, 49, 50, and 51. We resolve this question by concluding that the test the Second Circuit intended that we apply is whether the value at the time of the purchase of the acquired right approximates the amount of the nonrecourse note in each instance. This is the position of the Second Circuit set forth in Lebowitz v. Commissioner, 917 F.2d 1314, 1318 (1990), revg. and remanding T.C. Memo. 1989-178, where this point was squarely presented. The Second Circuit also pointed out in this case, 912 F.2d at 50, *81 that: In addition to the reasonableness of the relationship between the amount of the debt and the fair market value of the asset being purchased, courts have also stressed the importance of the presence or absence of incentives to the debtor to pay the debt. See, e.g., Odend'hal, 748 F.2d at 912; Durkin, 87 T.C. at 1376 * * *. An allocation of exploitation proceeds which the parties have designated as debt forming part of the purchase price is less likely to be recognized as genuine debt if the transaction is so structured that there is little or no incentive to the debtor to pay the debt with his own assets in the event of a shortfall.
Given the foregoing and other directions of the Second Circuit, we are precluded from agreeing with petitioners' assertion that the sole issue on this remand is whether the fair market value [of the films' income streams] bore a reasonable relationship to the debt incurred. The Second Circuit clearly directed us to consider the presence or absence of incentives to the debtor to pay the debt as well as other factors such as the structure of the transaction. The Second Circuit in this case ruled that *82 we should "value the asset purchased, so as to compare its value at the time of purchase with the debt." 912 F.2d at 50. (Emphasis added.) Therefore, petitioners properly concede that it is settled that "the valuation test is applicable as of the time of purchase", citing Lebowitz v. Commissioner, 917 F.2d at 1318. Although petitioners properly state the rule, they repeatedly refer to subsequent events in support of their position. We will apply the tests as of the time of the purchases. Another significant fact is that petitioners ignore our findings that they only had a profit interest in the films and ignore the Second Circuit's upholding of that finding. Petitioners continue to refer to themselves as, or compare themselves to, owners of films. In determining whether the fair market value bore a reasonable relationship to the debt, the Second Circuit directed us to consider a number of aspects petitioners argued were unusually favorable to petitioners. Petitioners allege the absence of cross-collateralization whereby profitable films subsidize the losing films was a favorable factor. They then claim "film owners" traditionally try *83 to avoid cross-collateralization. They are not film owners. As we discussed in our earlier opinion, the fact that the Vista partnership's interests in any one film could not depend on the success of any other film meant that for each film, additional payments over the guaranteed sum were contingent and speculative. In fact, the revenues generated from the one successful film, "Shampoo," could have been used by Vista to at least partially satisfy the notes for the other three films. The absence of cross-collateralization has another impact. It reduces the incentive on the part of Vista to satisfy out of its own funds the note for a less successful film in order to protect its interest in the profits of a more successful film. Petitioners' contention that cross-collateralization assured that Columbia would have every incentive to maximize revenue flies in the face of the incentive provided to Columbia, not only by its profits interests, but by its substantial distribution fees as set forth below. Persky-Bright
Total Distribution Fees 12/31/84
Summer Wishes, Winter Dreams  $ 939,070
Vista
Funny Lady  8,863,295
Breakout  5,924,905
Shampoo  11,381,804
Bite the Bullet  3,775,956
*84 The unusually low allowance for Columbia's overhead which the partnerships negotiated at 5-percent overhead cost instead of the ordinary 15-percent overhead cost is a favorable factor for petitioners. Petitioners also assert that the partnerships were not obligated to pay Columbia a standard 10 percent surcharge for advertising, but Mr. Persky admitted that at the times of these transactions the distributor generally laid out the cost for printing and advertising. To the extent the overhead allowance was favorable, we recognized it in reaching our conclusion that the transactions were entered into for profit. The advantageous fee schedule is pressed by petitioners as another favorable factor, who claim that effective rates of distribution fees as of December 1984 were 23.70 percent for Summer Wishes, Winter Dreams, 29.90 percent for Shampoo, 17.93 percent for Funny Lady, 20.13 percent for Bite the Bullet, and 25.48 percent for Breakout. The standard distribution fee for North America was 30 percent, for the United Kingdom up to 40 percent, and elsewhere was up to 42 percent. Based on our findings in our earlier opinion, we agree with respondent that we cannot tell what petitioners *85 based their "effective rates" upon, but a comparison of total receipts to total distributions as of December 31, 1984, results in the following effective rates: Total Receipts
Total Distribution
Film
as of 12/31/84
Fees as of 12/31/84
Rate
Persky-Bright
Summer Wishes, Winter Dreams   $ 3,065,049 $ 939,070   30.6%
Vista
Funny Lady $ 27,748,092
$ 8,863,295 31.9%
Breakout $ 19,175,332
$ 5,924,905 30.9%
Shampoo $ 34,592,976
$ 11,381,804
32.9%
Bite the Bullet $ 12,124,139
$ 3,775,956 31.1%
Nevertheless, recognizing that each film had foreign receipts, it is obvious that the partnerships had an advantageous fee schedule. This would be reflected in an earlier payment of distribution gross receipts which is a factor which we believe induced the partnerships to raise the cash payments they made to Columbia. The advantageous fee schedule again shows the profit objective we previously found. Petitioners also argue that the partnerships' entitlement to receive 25 percent of profits prior to paying the notes is a favorable circumstance based on testimony which assumes the partnerships were the owners of the film. Because the Second Circuit and *86 we have held that the partnerships are not the owners, but holders of a profit interest, this factor merely shows that the partnerships bargained for what they got -- an interest in the profits from the films. This is similar to what the third-party participants received. In making this argument, petitioners state the standard industry agreement would have proved that no share of the receipts "be paid to owners" until all distribution expenses were paid. The "owner" in this case is Columbia, not the two partnerships. Petitioners also state that the partnerships were able to retain a percentage of the receipts "before Columbia received any funds on account of its distribution services." This apparently is a reference to the specified minimum gross receipts provisions pertaining to Vista's films. Otherwise, Columbia was entitled to recoup all of its distribution fees and a substantial portion of its releasing costs before the partnerships were entitled to receive the full 25 percent of the distributable gross receipts. Petitioners' argument that there was the opportunity for the partnerships to earn 100 percent of the films' profits after paying the notes fails because *87 at the time of the transactions this was a theoretical opportunity, not a realistic opportunity. As we found, at the time the agreements were executed it was unlikely that the notes would be paid during the then anticipated useful life of 10 years. At that time all concerned anticipated that these films would produce most of their revenues in their first two years of exploitation. Columbia was not concerned about losing its 75 percent profit interest if a film was so successful that the note would be paid off because of the even more substantial distribution fees Columbia would receive. The partnerships were not concerned that the notes would be paid off because the partnerships could not reasonably assume any separate film would be a success, particularly in light of the fact that none of the films had been shown at the time of the purchase of the income rights. The partnerships properly assumed that they would receive some of the distributable gross receipts under their arrangements with Columbia. Petitioners also argue here, and had done so before the Second Circuit, that there was an obligation on Columbia to pay fair market value to acquire distribution rights in perpetuity *88 after 10 years. This is not a correct statement. Petitioners go on to claim that the right to renew would be subject to paying the greater of a specified monetary amount or the fair market value of the "films" and immediately change this by footnote to the fair market value of the distribution rights of the films based on an overly broad description of the formula. As we previously held, Columbia's rights under the distribution agreements were to be held in perpetuity. Under the agreements, Columbia has the right, not the obligation, to distribute the motion pictures in perpetuity by paying the greater of the so-called fair market value of the extended distribution rights at the time the distribution rights were extended, or an amount of $ 25,000 ($ 15,000 for "Summer Wishes, Winter Dreams" and $ 40,000 for "Funny Lady"). The agreements further provide that "fair market value" for such extensions was to be based on the average price paid by Columbia to extend the term of agreements relating to the distribution of comparable pictures pursuant to which Columbia had acquired the distribution rights for a 10-year term and had exercised a right to extend the term in perpetuity. This *89 is not the fair market value of each of the distribution agreements at the end of the 10-year term. The agreements provided that any amounts paid for an extension were deemed to be advances from Columbia to be recouped from each partnership's share of future distributable gross receipts. Petitioners recognize that the payment for extension of an agreement was an acceleration in the payment of distributable gross receipts otherwise to be paid to a partnership. Petitioners allege that this formula would guarantee that the partnerships would receive "millions of dollars". There is no support in the record for petitioners' assertion that this formula guaranteed or even that the formula would result in "millions of dollars" to the partnerships. At the time of the transactions, the values of the distribution rights 10 years down the road could not be ascertained. The modest sums agreed to by the parties probably approximate Columbia's estimates of their values at the time of the transactions. Mr. Persky was able to build a hindsight factor into the formula. This had value, but its value was unknown and not significant at the time the transactions took place. Petitioners argue that *90 the partnerships had perpetual ownership of the copyrights, offering them the opportunity to profit in the event of a sale. Petitioners ignore the fact that in determining that Columbia remained the owner of the films we enumerated the rights of Columbia and found that Columbia had the entire bundle of rights that is a copyright. At best, the partnerships were left with a mere "bare copyright". Markin v. Commissioner, T.C. Memo. 1989-665; Madden v. Commissioner, T.C. Memo. 1989-162; Meister v. Commissioner, T.C. Memo. 1988-487. We do not ascribe much significance to these bare copyrights. All the partnerships had was a contingent right to share in distributable gross receipts in the manner set forth in our original opinion. This was affirmed by the Second Circuit. Since we have been upheld in looking through the form of the agreements, for tax purposes we place no value on the language in the contracts which purports to transfer copyrights to the partnerships. Petitioners argue that the close relationship between the purchase price and the cost of producing the films is a favorable factor in valuing their contract *91 rights. The production costs of the films were reasonable, appropriate, and not excessive. Petitioners argue that a film's production costs may be a reliable indicator of fair market value (citing Evans v. Commissioner, T.C. Memo. 1991-272, quoting Vandenhoff v. Commissioner, T.C. Memo. 1987-116). Petitioners also cite to other cases in accord. We do not disagree with the cases which state that a film's production costs may be a reliable indicator of fair market value of a film. Under the circumstances of this case, we find that the fair market values of the films are equal to the completed production costs we previously found. Petitioners urge that we follow Evans v. Commissioner, T.C. Memo. 1991-272, where this Court included the total purchase price, which did not exceed the film's production costs, in the basis for depreciation of the contractual right to share in the film's profits. In the instant cases, the total purchase price exceeded the film's production costs for four of the five films in which the partnerships held contractual rights to share in the distributable gross receipts from the films. Thus, the *92 Evans case is distinguishable on its facts. Moreover, we note that the Evans case was subject to the constraints of the reversal by the Eighth Circuit, Evans v. Commissioner, 908 F.2d 369 (1990), of the prior disposition of the case in Evans v. Commissioner, T.C. Memo. 1988-468. As this Court explained in Law v. Commissioner, 86 T.C. 1065, 1100 (1986), where only a profits interest in a film is purchased, it is irrelevant to the determination of the genuineness of nonrecourse debt that the total purchase price may have equaled the fair market value of the film. To the same effect, see Vandenhoff v. Commissioner, supra; Upham v. Commissioner, T.C. Memo. 1989-253 (1989), affd. 923 F.2d 1328 (8th Cir. 1991). Petitioners seem to overlook the fact that we held, and were sustained on appeal by the Second Circuit, that they did not purchase the films but only purchased contract rights to participate in the exploitation proceeds of the films. On remand, petitioners claim that because their expert, Leo Greenfield, "valued the estimated income and expenses of *93 the films under the actual distribution agreements that the Partnerships signed, his estimates for the films' fair market value are coextensive with the fair market value of the income stream rights that this Court found the Partnerships purchased." This simply is a non sequitur. On the other hand, respondent made elaborate adjustments, some based on his assumptions, in his experts' valuations of the films to derive detailed values in appendices to his remand brief. Petitioners object to the use of these values, and we shall not use them. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Kreis' Estate v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; Tripp v. Commissioner, 337 F.2d 432 (7th Cir. 1964), affg. T.C. Memo. 1963-244. Under the circumstances, we find that the parties have left us without any expert opinions on the value of the partnerships' contract rights on which we can rely. Respondent's expert, William Madden, held the view that his estimated cash flows had to be reduced by 50 percent for profit and risk to determine *94 the value of a film at the time of the transactions because of the speculative and very risky nature of the movie industry. Petitioners criticize this 50 percent discount as too high with respect to the sale of a film. But Columbia only sold contract rights, not the films, to the partnership. On the entire record, and in light of the uncertainty of the degree of success of a film prior to its release and the undisputed fact that the movie industry is a risky business, we believe a 50 percent reduction in the fair market value of the films properly would reflect the fair market value at the time of the transactions of the partnerships' contract interests in the films. Accordingly, we find that the fair market values of the films and of the partnerships' income rights are as follows: PERSKY-BRIGHT/AS OF OCTOBER 15, 1973
Fair Market Value
Fair Market Value
of Film
of Contract Rights
Summer Wishes, Winter Dreams
$ 1,939,822
$ 969,911
VISTA/AS OF DECEMBER 20, 1974
Funny Lady
$ 10,654,836
$ 5,327,418
Breakout
5,961,188
2,980,594
Shampoo
5,776,581
2,888,291
Bite the Bullet
5,176,769
2,588,385
We next compare the fair market value of the contract rights *95 at the time of the transactions to the amount of the related nonrecourse note: Contract Rights
Note
Summer Wishes, Winter Dreams
$ 969,911  $ 1,850,000
Funny Lady
5,327,418
9,500,000
Breakout
2,980,594
5,875,000
Shampoo
2,888,291
5,400,000
Bite the Bullet
2,588,385
5,400,000
Based on our findings, the fair market value of each contract right securing the debt does not reasonably approximate the principal amount of the respective debt. Therefore, the notes are not a part of basis for purposes of depreciation, and the notes are not genuine in terms of supporting interest deductions under the criteria set forth by the Second Circuit. Lastly, contrary to petitioners' contentions, the Second Circuit directed us to make further findings as to the incentives to the debtor to pay the notes out of personal assets. In this regard, the Second Circuit suggested that we discuss the provision that if the notes were not fully paid after ten years, Columbia was entitled to foreclose the interests of the partnerships. We do not consider this provision as significant as it may appear for reasons set forth below and because we believe from the outset that Columbia's principal *96 concern about these films was to control the rights to the distribution fees. That is where the most significant earnings could be anticipated. If we are directed to look at the end of the 10-year period, we find that Columbia and Persky-Bright had agreed to extend the distribution agreements and the due dates of the nonrecourse notes in order to give themselves sufficient time to establish the "fair market value" of the extended distribution rights of the film. Similarly, Columbia and Vista had agreed to extend the terms of the distribution agreements in order to give themselves time to establish the "fair market value" of the extended distribution rights of the films, as well as to resolve the disputes concerning the amounts due Vista from Columbia uncovered by the partnership's most recent audit. Based on Mr. Persky's testimony, it is clear that the partnerships in 1985 were not thinking of putting more money into the films. The partnerships were concerned with getting direct income, not buying out the notes. In fact, in pressing for the extension of Columbia's renewal agreements, Columbia's representative brought up the subject of a buyout of the notes. As Mr. Persky testified: *97 "This buyout is not anything I really pursued so far because that has to come from Columbia." Mr. Persky stated that Columbia never made a firm offer in this regard. Why Columbia was suggesting a buyout instead of a foreclosure is puzzling. In any event, Columbia was not pressing the partnerships in terms of foreclosure even though every extension of the notes and of the distribution agreements was initiated by Columbia. Columbia never indicated to Mr. Persky that Columbia intended to foreclose on the notes. Mr. Persky told Columbia that due to the pending claims, Columbia could not foreclose on the notes, or the partnerships would do everything to prevent the renewal of the distribution agreements, the matter of greatest concern to Columbia. In 1985, the partnerships were interested in determining the then value of the films in terms of setting the prices for the renewal of the distribution agreements. The partnerships were not contemplating taking money out-of-pocket to satisfy any outstanding notes. At the time of trial, Vista had asserted $ 3,584,005 of additional claims and a "Bite the Bullet" breach of warranty claim in the amount of $ 1,411,315. Of the $ 3,584,005 in *98 additional claims, $ 1,636,225 was designated as payment of notes and interest, with the remaining $ 1,947,780 designated as due to Vista. Clearly, Vista was seeking to obtain as much income as possible from the films. Nevertheless, we believe the actions of the parties indicate that the partnerships were to continue to share in the exploitation income from the films, and Columbia was to continue to receive its distribution fees. We previously detailed our analysis which concluded that the transactions were so structured that there was no economic incentive for the partners to pay off the purchase notes. Based on that analysis, our other prior findings of fact, and the foregoing additional findings, we conclude that the notes were merely contracts to divide the exploitation proceeds of the films. This is one of the conclusions the Second Circuit indicated was possible. 912 F.2d at 49. We have considered the other arguments of the parties and find them to be without merit. Accordingly, we find that the notes in question should not be recognized as part of the purchase price, depreciation should not be allowed upon the notes, and the partnerships are not entitled *99 to deduct interest with respect to the notes. Decisions will be entered in the amounts previously decided. Footnotes
1. Cases of the following petitioners are consolidated herewith: Guy B. Bailey, Jr. and Lois M. Bailey, docket Nos. 10193-78 and 4505-82; Bernard B. Neuman and Miriam Neuman, docket No. 3781-85.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩