Guy B. BAILEY, Jr., Lois M. Bailey, Bernard B. Neuman, and Miriam Neuman, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 136, Docket 92–4056.

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1992.

Decided April 20, 1993.

Before: FEINBERG and KEARSE, Circuit Judges.*

KEARSE, Circuit Judge:

Petitioners Guy B. Bailey, Jr., Lois M. Bailey, Bernard B. Neuman, and Miriam Neuman (collectively "taxpayers") appeal from final decisions of the United States Tax Court, Irene F. Scott, *Judge*, finding deficiencies in their income taxes for certain years during the period 1973–1976. The tax court, following a remand from this Court on taxpayers' prior appeal, *Bailey v. Commissioner*, 912 F.2d 44 (2d Cir.1990) (*"Bailey I"*), ruled that nonrecourse notes used to purchase certain motion picture rights should be disregarded for income tax purposes and hence that related deductions should be disallowed. On this appeal, taxpayers challenge the tax court's findings as to the fair market value of their contract rights and as to their lack of incentive to pay off the notes out of personal assets. For the reasons below, we affirm.

## I. BACKGROUND

Most of the events leading to this dispute are uncontested and are described in detail in *Bailey I*, familiarity with which is assumed. They will be only briefly summarized here.

### A. The Events

Guy B. Bailey, Jr., and Bernard B. Neuman were limited partners in Vista Company ("Vista") and Persky–Bright Associates ("Persky–Bright"), respectively, two partnerships that invested in feature-length commercial films (collectively the "Partnerships"). Persky–Bright and Vista purchased rights to certain unreleased films belonging to Columbia Pictures Corp. ("Columbia") and simultaneously licensed the films' distribution rights back to Columbia. Persky–Bright invested in one film, *Summer Wishes, Winter Dreams;* Vista invested in four films: *Shampoo, Breakout, Funny Lady,* and *Bite the Bullet.*

Pierce O'Donnell, New York City (Michael Malina, Peter L. Faber, Richard A. De Sevo, Laurie Abramowitz, Kaye, Scholer, Fierman, Hays & Handler, Richard A. Levine, Carlton M. Smith, Roberts & Holland, on the brief), for petitioners-appellants.

Nancy G. Morgan, Attorney, Tax Div., Dept. of Justice, Washington, DC (James A. Bruton, Acting Assistant Attorney General, Gary R. Allen, Gilbert S. Rothenberg, Attorneys, Tax Div., Dept. of Justice, on the brief), for respondent-appellee.

---

* Honorable Robert F. Peckham, Senior Judge of the United States District Court for the Northern District of California, originally a member of the panel, died in February 1993. This appeal is being decided by the remaining members of the panel pursuant to Local Rule § 0.14(b).

The investment in *Summer Wishes, Winter Dreams*, which was similar to the other transactions at issue, was accomplished by purchase and distribution agreements simultaneously executed in October 1973, and amended in June 1974. The amended purchase agreement granted Persky–Bright all "right, title and interest" in the film in exchange for $2 million, which was 133% of the amount that Columbia warranted as the minimum production cost of the film; the completed production cost of the film was actually $1,939,822. The purchase was to be accomplished by three cash payments extending over a one-year period totalling $150,000, plus a nonrecourse promissory note for $1,850,000, secured by a lien on the film and its proceeds. In addition, by September 1974 Persky–Bright was to prepay $225,000 in interest. The promissory note was payable 10 years from the date of the agreement and bore interest at a rate of 12% for the first year, and 10% for each subsequent year. If the principal and interest were not fully paid upon maturity, Columbia was entitled to foreclose on the film and terminate Persky–Bright's interest.

The amended distribution agreement granted Columbia the exclusive right to distribute the film for 10 years and an option to extend that term in perpetuity by paying an advance of the greater of $15,000 or the "fair market value" of the extension, based on the average price paid by Columbia for similar extensions. Columbia was to receive a percentage of the film's gross receipts as its distribution fee. In addition, Columbia was entitled to recover certain of its costs from the film's gross receipts. Persky–Bright was to receive 25% of the film's net proceeds; Columbia was to receive the remaining 75% as payment on the promissory note. After the note's principal and accrued interest were fully paid, Persky–Bright was to receive 100% of the film's net proceeds.

Vista invested in four Columbia films in similar transactions for stated prices ranging from 125% to 131% of the films' warranted production costs. The completed production costs and the nonrecourse promissory notes with respect to these films were as follows:

|  | Cost | Nonrecourse Note |
|---|---|---|
| *Shampoo* | $ 5,776,581 | $5.4 million |
| *Breakout* | $ 5,961,188 | $5.875 million |
| *Funny Lady* | $10,654,836 | $9.5 million |
| *Bite the Bullet* | $ 5,176,769 | $5.4 million |

The notes on these films were not cross-collateralized; thus, the earnings of a particular film were not to be applied by Columbia as payment of the notes on the other films.

At the time of trial, Vista had paid its note on *Shampoo* in full and hence was receiving 100% of the current profits from that film. However, the other four films had failed to earn enough to pay off their notes. Taxpayers contend that the shortfall was caused by a failure on the part of Columbia to account properly for profits; they are engaged in litigation with Columbia over its accounting, and they claim that the earnings of the other four films, upon a proper accounting, will not only pay the notes in full but also produce substantial profits for the Partnerships.

In computing their income taxes for the pertinent years, taxpayers reported their shares of the Partnerships' income and losses, which included deductions for depreciation of the films and for interest paid on the nonrecourse notes. The Internal Revenue Service disallowed these deductions and assessed tax deficiencies for the years 1973–1976. Taxpayers challenged that determination in the tax court.

## B. *The Prior Proceedings*

In its initial decision, the tax court, Irene F. Scott, *Judge*, adopting the opinion of Special Trial Judge John J. Pajak, ruled, *inter alia*, that taxpayers were not entitled to depreciation deductions on the films themselves because the Partnerships had not acquired ownership of the films, but that taxpayers could take depreciation deductions on their

contract rights to receive portions of the films' proceeds. *See* 90 T.C. 558, 614, 1988 WL 26418 (1988). However, stating that "when debt principal is payable solely out of exploitation proceeds, nonrecourse loans are contingent obligations and are not treated as true debt," *id.* at 616, the court held that the nonrecourse notes at issue here did not represent genuine debt. Consequently, it ruled that the value of the notes should be excluded from the depreciable bases of taxpayers' contract rights and that taxpayers' interest payments on the notes were not deductible.

In *Bailey I,* we affirmed the rulings that the Partnerships were not the owners of the films and that taxpayers therefore were not entitled to depreciation deductions on the films themselves. *See* 912 F.2d at 47–48. We also affirmed the ruling that taxpayers were entitled to such deductions on their contract rights in the films, *see id.* at 48, but we noted that the tax court had made no finding as to the value of those rights, *see id.* at 49. We concluded that the tax court could not properly refuse to recognize the nonrecourse notes as genuine debt simply on the ground that the notes were payable out of the films' exploitation proceeds. Though we agreed that this factor argued against recognition of the debt as genuine, we stated that "[o]ther factors, particularly a reasonable relationship between the amount of the debt and the value of the securing asset, and incentives to the debtor to pay the debt out of personal assets, may require a different conclusion notwithstanding that the notes are nonrecourse." *Id.* at 48. We noted that "'[e]xclusion from basis of nonrecourse debt absent a specific finding on valuation should be permitted only in "rare and extraordinary cases."'" *Id.* (quoting *Estate of Baron v. Commissioner,* 798 F.2d 65, 70 (2d Cir. 1986)). Because "it was critically important for the trial court to value the asset purchased, so as to compare its value at the time of purchase with the debt incurred as part of the purchase price," *Bailey I,* 912 F.2d at 50, we remanded to the tax court for further findings.

### C. *The Proceedings on Remand*

Following additional briefing on remand, the tax court, in a supplemental opinion, made findings on the questions raised in *Bailey I* as to (1) the relationship between the amount of each debt and the value of the securing asset, and (2) taxpayers' incentives to pay the debt out of personal assets, and again ruled that the nonrecourse notes did not represent genuine debt. *See* 63 T.C.M. (CCH) 2000, 2006, 1992 WL 17460 (1992). In its supplemental opinion, the court adhered to its earlier findings of fact that were not overturned by *Bailey I, see, e.g.,* 90 T.C. at 617 ("only one out of any six films could be expected to earn its own production costs"); *id.* at 610–11 (at the time of the transactions, "the anticipated economic useful life of [the films] was approximately 10 years"), and found on remand that "at the time the agreements were executed it was unlikely that the notes would be paid during the then anticipated useful life of 10 years. At that time all concerned anticipated that these films would produce most of their revenues in their first two years of exploitation." 63 T.C.M. (CCH) at 2003. Though taxpayers argued that the 10–year period was not the appropriate frame of reference because of their expectation of large profits upon extension of the distribution agreement with Columbia, the tax court was unpersuaded:

> There is no support in the record for petitioners' assertion that th[e] formula [for extension of the distribution] guaranteed or even that the formula would result in "millions of dollars" to the partnerships. At the time of the transactions, the values of the distribution rights 10 years down the road could not be ascertained. The modest sums agreed to by the parties probably approximate Columbia's estimates of their values at the time of the transactions. Mr. Persky was able to build a hindsight factor into the formula. This had value, but its value was unknown and not significant at the time the transactions took place.

*Id.* at 2004.

With respect to the precise valuation of the Partnerships' contract rights at the time of the purchase of those rights, the court first found that the fair market value of the films themselves was equal to their completed production costs. *See id.* The Partnerships owned not the films themselves, however, but

only contract rights to a share of the films' earnings, and, rejecting taxpayers' contention that the value of those rights was identical to the value of the films themselves, the court found that the value of the Partnerships' contract rights should be estimated at 50% of each film's market value:

On the entire record, and in light of the uncertainty of the degree of success of a film prior to its release and the undisputed fact that the movie industry is a risky business, we believe a 50 percent reduction in the fair market value of the films properly would reflect the fair market value at the time of the transactions of the partnerships' contract interests in the films.

*Id.* at 2005. Thus, the court found that the value of the Partnerships' rights in the films, as compared to the films' market values, were as follows:

|  | Market Value of Contract Rights | Amount of Nonrecourse Note |
|---|---|---|
| Summer Wishes, Winter Dreams | $ 969,911 | $1.85 million |
| Shampoo | $2,888,291 | $5.4 million |
| Breakout | $2,980,594 | $5.875 million |
| Funny Lady | $5,327,418 | $9.5 million |
| Bite the Bullet | $2,588,385 | $5.4 million |

As the Partnerships' rights in a given film were found to be worth no more than 48–56% of the face value of the corresponding nonrecourse note, the court concluded that there was not a reasonable relationship between the value of the securing assets and the amount of nonrecourse debt.

As to whether taxpayers had incentives to pay a given note out of personal assets, the court, citing the analysis in its initial opinion, again concluded that the transactions were structured so that the Partnerships lacked such incentives. The court found that the absence of cross-collateralization reduced the incentive to satisfy the note on a less successful film. *See id.* at 2002. It also inferred that taxpayers had no incentive resulting from the right of Columbia to foreclose on any unpaid notes at maturity, for it found that in 1985 Columbia was making no effort to exercise that right. *See id.* at 2005. The Court found that the "partnerships were not contemplating taking money out-of-pocket to satisfy any outstanding notes." *Id.* at 2006.

Having found that there was not a close relationship between the amount of the debts and the value of the securing assets and that taxpayers lacked incentives to pay the debts out of their personal assets, the court concluded that the nonrecourse notes should not be regarded as part of the purchase price of the contract rights in question, that depreciation thus should not be allowed on the notes, and that the partnerships were not entitled to deduct interest with respect to the notes.

This appeal followed.

## II. DISCUSSION

On appeal, taxpayers contend principally that the tax court erred in finding (1) that the value of the Partnerships' contract rights was not reasonably related to the amount of nonrecourse debts secured by those rights and (2) that the Partnerships lacked incentive to repay the debts. Finding no clear error in the tax court's findings of fact, we affirm.

■■■■ Nonrecourse debt may constitute part of a taxpayer's basis in property when the fair market value of the property securing the debt reasonably approximates the principal amount of the debt. *See Lebowitz v. Commissioner*, 917 F.2d 1314, 1318 (2d Cir.1990); *Bailey I*, 912 F.2d at 48; *Estate of Baron v. Commissioner*, 798 F.2d 65, 68 (2d Cir.1986). Generally, "a nonrecourse debt that does not exceed the value of the security is genuine, because, if the taxpayer defaults, he will lose an asset worth more than the amount of the debt," *Lebowitz v. Commissioner*, 917 F.2d at 1318, and he therefore

has an incentive to pay the debt, *see id.;* *Odend'hal v. Commissioner,* 748 F.2d 908, 912 (4th Cir.1984), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); *see also Estate of Isaacson v. Commissioner,* 860 F.2d 55, 56 (2d Cir.1988) (per curiam) (nonrecourse mortgage that exceeded value of securing asset not genuine debt, as borrower had no incentive to pay off mortgage). However, if it is unlikely that the taxpayer has an incentive to pay the debt, then the debt does not represent a genuine obligation and will be disregarded for tax purposes. *See Estate of Baron v. Commissioner,* 798 F.2d at 68–69; *Durkin v. Commissioner,* 872 F.2d 1271, 1276 (7th Cir.), *cert. denied,* 493 U.S. 824, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989); *Odend'hal v. Commissioner,* 748 F.2d at 913; *see also Bailey I,* 912 F.2d at 50 (debt less likely to be recognized as genuine "if the transaction is so structured that there is little or no incentive to the debtor to pay the debt"). Indeed, "it would be manifestly unfair to permit a taxpayer to enjoy the benefits of deducting as losses an alleged indebtedness for which there had been no economic incentive or expectation of repayment." *Estate of Baron v. Commissioner,* 798 F.2d at 68–69.

■ To decide whether a taxpayer had an incentive to pay a nonrecourse debt, a court must determine what the value of the securing asset and the expectations of the parties were at the time of the transaction; subsequent events are not relevant. *See, e.g., Lebowitz v. Commissioner,* 917 F.2d at 1318; *Durkin v. Commissioner,* 872 F.2d at 1277; *Polakof v. Commissioner,* 820 F.2d 321, 324 n. 6 (9th Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). The tax court's findings as to these matters may not be overturned unless they are clearly erroneous. *See, e.g., Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218 (1960), *Bailey I,* 912 F.2d at 47. A trial court's finding is not clearly erroneous when it is based on the court's choice between two permissible inferences or views of the evidence. *See Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

## A. The Value of the Contract Rights

In challenging the tax court's finding that the fair market value of their contract rights was less than the fair market value of the films, taxpayers contend that the tax court's finding that the fair market value of the films was their production costs "should have been the end of the matter since [, *inter alia,*] as a matter of economics and common sense, the fair market value of the contract rights the Partnerships purchased—the right to receive all of the films' net income—was at least equal to the values of the films...." (Petitioners' brief on appeal at 23.) We disagree, because the tax court permissibly found that taxpayers' factual premise was flawed.

■ As taxpayers concede, the tax court did not err in finding that the fair market of the films themselves was equal to the cost of their production. But as the court found in its initial decision, and as we affirmed in *Bailey I,* the Partnerships did not own the films themselves. Taxpayers' suggestion that the market value of the contract rights acquired by the Partnerships was identical to the market value of the films is premised on their proposition that the Partnerships purchased the right to receive 100% of the net income of the films in perpetuity. This premise suffers two major flaws.

First, as to the films at issue here, the value of the "net income" paid to the Partnerships would not be an adequate measure of the fair market value of the films themselves, because Columbia retained the right to receive a large percentage of the films' gross receipts, over and above unreimbursed distribution costs, as "distribution fees." Because Columbia retained this significant economic interest in the films, the Partnerships' right to receive the films' remaining "net income" was necessarily worth less than the films themselves.

Further, the Partnerships' rights at the conclusion of the initial 10–year period were circumscribed. As the tax court found, "Columbia's rights under the distribution agreements were to be held in perpetuity." 63 T.C.M. (CCH) at 2003. If the Partnerships were to fail to pay off a film's note in ten years, Columbia would have the right to ter-

minate the Partnerships' interest in the film. Even if a film's note were to be fully paid, Columbia would still have the option to retain its distribution rights by paying the Partnerships an advance, which would be recouped out of the net income payable to the Partnerships. *See id.* Hence, the Partnerships did not have the right to sell the films' perpetual distribution rights; instead, they had the right only to receive an advance from Columbia for those rights.

We conclude that the evidence easily supported the tax court's finding that the fair market value of the Partnerships' contract rights was significantly less than the fair market value of the films themselves.

### B.  *The Incentive To Repay the Debt*

■ We also see no clear error in the tax court's finding that the Partnerships lacked incentives to pay off the nonrecourse notes out of personal assets.  Given the fact that the nonrecourse debts for the films in question ranged from 89% to 104% of the cost of production, together with the evidence that only one out of every six films was normally expected to earn its production costs, and the fact that only 75% of each film's earnings was dedicated to payment on that debt, the court's finding that taxpayers anticipated that the earnings generated by the films themselves would fail by a significant margin to cover the nonrecourse notes was unimpeachable.

■ Further, the court's findings as to the extent and profile of the useful life of the films were supported by the testimony of one of taxpayers' witnesses that in 1973–1975 a film would be expected to earn the "bulk" of its theatrical exhibition revenue "within the first two years" of release and would be expected to earn most of its revenue, including revenue from television network sales and syndication, within 10 years of release. The court's decision to credit this testimony was well within its province as factfinder, and its finding that taxpayers expected a given film to have an economically useful life of approximately 10 years was not clearly erroneous.  In light of this 10–year–life expectation, along with the lack of cross-collateralization, the court was entitled to infer that taxpayers did not anticipate that the nonre-

course notes would be paid in order to obtain rights beyond the initial 10–year period: each film would either earn an amount equivalent to the face amount of its note within 10 years or it wouldn't; in the unlikely event that it did earn that amount, the note would be canceled; if it did not earn that amount, the film would not be expected to have any further value, and hence taxpayers would be unlikely to use personal assets to pay off the note.

Though there were some countervailing considerations, the tax court weighed them and found that the preponderance of the evidence required the finding that taxpayers did not have the requisite incentive.  Given the record as a whole, we cannot say that that finding is clearly erroneous.  Thus, the tax court's finding that "the transactions were so structured that there was no economic incentive for the partners to pay off the purchase notes," 63 T.C.M. (CCH) at 2006, was not clearly erroneous, and this finding supported the court's determination that the nonrecourse debt should be disregarded for tax purposes.

### CONCLUSION

We have considered all of taxpayers' arguments on this appeal and have found them to be without merit.  The decisions of the tax court are affirmed.